# In the United States Court of Federal Claims

No. 16-268C
(Filed:  January 26, 2017)

| | |
|---|---|
| *********************************** | RCFC 12(b)(1); RCFC 12(b)(6); Motion to |
| CANPRO INVESTMENTS LTD.,                *  | Dismiss; Jurisdiction; Submission of |
|                                   * | Claims to Contracting Officer; RCFC 9(k); |
|           Plaintiff,                     * | Failure to State a Claim Upon Which |
|                                   * | Relief Can Be Granted; Breach of Contract; |
| v.                                                     * | Contractual Duty; Implied Obligation; |
|                                   * | Superior Knowledge; Mutual Mistake; |
| THE UNITED STATES,                       * | Misrepresentation; Concealment; Good |
|                                   * | Faith and Fair Dealing; Impossibility of |
|           Defendant.                   * | Performance; Commercial Impracticability; |
| *********************************** | Restitution for Frustration of Purpose |

Esperanza Segarra, Coral Gables, FL, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

      In this case, plaintiff CanPro Investments Ltd. ("CanPro") seeks damages pursuant to a lease with the General Services Administration ("GSA") of the United States government for commercial space to house a local office of the Social Security Administration ("SSA").  CanPro also seeks termination of the lease.  Defendant United States moves to dismiss CanPro's complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim upon which this court can grant relief.  For the reasons set forth below, the court grants in part and denies in part the motion to dismiss.

## I.  BACKGROUND

      CanPro is a foreign corporation with its principal place of business in Montreal, Canada.[1] Compl. ¶ 2.  CanPro owns, operates, and manages a commercial office building in Boca Raton, Florida that is known as One Park Place.  Id.  One Park Place is a multistory building containing

---

      [1]  The court derives the facts in this section from CanPro's complaint ("Compl."), including the attached exhibits ("Compl. Ex."), and from the certified claim submitted to the GSA contracting officer, which is part of the appendix to CanPro's response to defendant's motion to dismiss ("Pl.'s App.") and is incorporated by reference into CanPro's complaint.  See generally Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325-26 (Fed. Cir. 2016).

over 237,000 square feet of Class A office space.[2]  Id. ¶ 7.  CanPro leases space in One Park Place to various corporate and organizational tenants, and also maintains its own offices in the building.  Id. ¶ 8.

On August 22, 2011, the GSA issued a Solicitation for Offers ("SFO") seeking lease proposals for the local SSA office.  Id. ¶ 9; Compl. Ex. A at 1, 3, 13; see generally Compl. Ex. A at 13-75 (containing the SFO as issued).[3]  The GSA sought 13,220 square feet of rentable space with 11,495 square feet of usable space.  Compl. ¶ 9; Compl. Ex. A at 17.  In response, CanPro submitted a proposal on September 21, 2011, to lease office space at One Park Place to the GSA for the use of the SSA.  Compl. ¶ 11.  On March 19, 2012, the GSA amended the SFO to seek 11,495 square feet of rentable space with 9,978 square feet of usable space.  Id. ¶ 12; Compl. Ex. A at 3.  CanPro believes that the GSA modified the SFO to provide for a smaller space to allay concerns regarding excessive space and excessive spending.  Compl. ¶¶ 13-14.

During negotiations, CanPro inquired as to the expected daily volume of visitors to the SSA office at One Park Place.  Id. ¶ 15.  According to CanPro, the GSA and/or the SSA represented that visitors to the SSA during "peak times" would not exceed 250 per day despite the fact that "the GSA knew or should have known" that the number of visitors would be greater due to anticipated SSA office closings in the surrounding area.[4]  Id. ¶¶ 16-20; Pl.'s App. 5, 13,

---

[2]  Pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, the court takes judicial notice that the Building Owners and Managers Association International groups office space into three classes to provide subjective quality ratings:

- Class A:  Most prestigious buildings competing for premier office users with rents above average for the area.  Buildings have high quality standard finishes, state of the art systems, exceptional accessibility and a definite market presence.

- Class B:  Buildings competing for a wide range of users with rents in the average range for the area.  Building finishes are fair to good for the area.  Building finishes are fair to good for the area and systems are adequate, but the building does not compete with Class A at the same price.

- Class C:  Buildings competing for tenants requiring functional space at rents below the average for the area.

Building Class Definitions, Bldg. Owners & Managers Ass'n Int'l, http://www.boma.org/research/pages/building-class-definitions.aspx (last visited Jan. 26, 2017).

[3]  Because CanPro did not paginate the exhibits to its complaint, the court uses the page numbers assigned by its electronic filing system.

[4]  The record before the court does not provide any insight regarding the frequency, duration, or expected dates of the purported peak times.

18, 25, 27-28.  On or about September 13, 2012, the GSA awarded the lease to CanPro.  Compl. ¶ 21.

CanPro and the GSA executed the lease that is the subject of this action on October 22, 2012.  Id. ¶ 22; Compl. Ex. A at 8; Pl.'s App. 5.  The lease was for a fifteen-year term, and allowed the GSA to cancel the lease at any time after ten years upon ninety days advance written notice.  Compl. Ex. A at 8-9.  The lease included 11,475 square feet of rentable space with 9,978 square feet of usable space on the fourth floor of One Park Place, fifty-eight parking spaces, various tenant improvements to be completed prior to occupancy, and the rent schedule.  Id.  The lease also expressly incorporated various attachments into the lease, including the SFO, SSA office specifications, and representations and general clauses forms.[5]  Id.  In addition, the lease indicated that it "contain[ed] the entire agreement of the parties and no prior written or oral agreement, expressed or implie[d], [would] be admissible to contradict" its provisions.  Id. at 10.  The lease further stipulated that the "GSA assume[d] no financial responsibility for any cost incurred by [CanPro]" except as otherwise provided by the lease terms or authorized by the contracting officer.  Id. at 11.  In particular, clause 5.13 of the SFO emphasized that CanPro would have no claim against defendant for "the Government's normal and customary use of the leased premises."  Id. at 39.

On December 18, 2013, the lease was amended to allow CanPro to proceed with its proposed tenant improvements.  Id. at 2.  On April 2, 2014, CanPro and the GSA again amended the lease to approve increased costs for the tenant improvements and establish the term of the lease.  Id. at 4-5.  The amended lease term provision of the contract provided:  "To Have And To Hold the said Premises with their appurtenances for the term beginning February 18, 2014 and continuing through February 17, 2029 subject to termination and renewal rights as may be hereafter set forth, to be used for such purposes as determined by GSA."  Id. at 5.

On March 6, 2014, shortly after the beginning of the lease term, the SSA's West Palm Beach location was closed to the public.  Pl.'s App. 28.  This closure resulted in an "overwhelming amount of visitors" to the SSA office at One Park Place which, in turn, resulted in numerous complaints from other tenants at One Park Place due to increases in wait times for elevators and the number of people wandering throughout the building and common areas, thereby causing the parking and building facilities to be "stretched beyond anticipated normal usage."  Id.  CanPro's property manager contacted the SSA district manager and the GSA regional building manager on September 9, 2014, to request a meeting regarding the complaints of overcrowding at One Park Place stemming from the SSA's receiving over 500 visitors per day, more than double the anticipated visitor volume and anticipated load rate for the building.  Id. at 26-27.  At the meeting, which was held on September 17, 2014, the SSA explained that the increased visitor traffic at One Park Place was a temporary situation resulting from the closure of its West Palm Beach office.  Id. at 25.

CanPro, through counsel, followed up on October 1, 2014, via certified letter.  Id. at 18.  In the letter, CanPro reminded the SSA and the GSA that the expected visitor volume to the SSA office was not to exceed 250 daily during peak times, that One Park Place could not

---

[5]  These various documents are included in Exhibit A attached to CanPro's complaint.

accommodate a higher volume during peak times, and that the leased premises could only accommodate a maximum of ninety-eight visitors at any one time.  Id.  CanPro then demanded that the situation at One Park Place be rectified within five business days.  Id. at 19.  Just over one month later, on or before November 5, 2014, One Park Place was downgraded to Class B status.  Id. at 12.

On November 12, 2014, CanPro filed a certified claim with the GSA contracting officer. Id. at 4; Compl. ¶ 5; Compl. Ex. B at 1.  In its claim, CanPro alleged the following:

- During lease negotiations, all parties understood that the SSA's intended visitor volume would be reasonable, not to exceed 250 daily.

- Visitors to the SSA's office at One Park Place regularly exceed 400-500 daily.

- There is insufficient space to accommodate the excess visitors, which is disruptive to the entire building.  CanPro regularly receives complaints from other tenants regarding the SSA's visitors.

- The excessive volume of SSA visitors has resulted in (1) numerous arrests for drugs and weapons, (2) tenants fearful of their safety, (3) litter, (4) harassing behavior, (5) loitering, (6) creation of de facto smoking areas and waiting rooms, and (7) visitors leaving personal items behind.

- The perception of One Park Place in the Boca Raton office marketplace has deteriorated.

- The SSA's manner of conducting business is "totally beyond any reasonable use of the premises."

- The GSA "materially breached" the lease and the "implied covenant of reasonable use" by scheduling and accommodating approximately 500 visitors daily.

- CanPro suffered loss of tenants, loss of quiet use and enjoyment, loss of reputation and business relationships, excess physical damage to the building, and increased security and maintenance expenses.

- CanPro provided ample notice and opportunity for the GSA and the SSA to remedy the situation.

Pl.'s App. 4-10.  CanPro demanded $250,000 in damages, termination of the lease, and alternative dispute resolution by mediation.  Id. at 9-10; Compl. ¶ 5; Compl. Ex. B at 1-2.

While waiting for the contracting officer's decision, CanPro filed, on December 31, 2014, a complaint in this court seeking a preliminary injunction against the SSA's "ostensible misuse" of the leased premises at One Park Place, a misuse which CanPro claimed was leading to unaddressed safety issues.  CanPro Invs. Ltd. v. United States, 120 Fed. Cl. 17, 19-20 (2015). The contracting officer issued a notice on January 6, 2015, while the case was pending, that a final decision would be issued by March 7, 2015.  Id. at 22-23.  On January 29, 2015, the court dismissed the complaint for injunctive relief as not ripe for review since the contracting officer had not yet issued a final decision.  Id.

The GSA contracting officer issued a final decision on March 6, 2015, denying CanPro's claim in its entirety.  Compl. ¶ 6; Compl. Ex. B at 1-3.  The contracting officer pointed out that the thrust of CanPro's claim pertained to the number of visitors to the SSA office at One Park Place, but that CanPro failed to identify a specific clause in the lease limiting the number of daily visitors because there was no such clause.  Compl. Ex. B at 1.  The contracting officer also highlighted the lack of a demonstrable connection between the visitors and the SSA; the lack of a lease clause prohibiting the alleged actions of the SSA's visitors; and the lack of any documentation to support the $250,000 in claimed damages, noting that the changes clause in the lease addressed equitable adjustments for costs resulting from changed conditions.  Id. at 2; see also Compl. Ex. A at 101-02 (containing the "Proposals for Adjustment" and "Changes" clauses).  Since there was no breach of the lease and no support for the $250,000 claim, the contracting officer explained, there was no basis for termination of the lease.  Compl. Ex. B at 2. The contracting officer further explained that mediation was a voluntary option and that the GSA was within its rights in choosing not to pursue it.  Id.

This action followed on February 25, 2016.  In its complaint, CanPro alleges that the SSA regularly receives 350-700 daily visitors.  Compl. ¶ 24.  CanPro further alleges that the building space cannot accommodate more than 250 daily visitors, and that the SSA's visitors have exhibited significant disruptive behavior, causing CanPro to experience additional maintenance and security costs (such as hiring full-time security guards), decreased use and enjoyment of the property, damage to its reputation, litigation expenses, and lost business opportunities.  Id. ¶¶ 24-33.  Finally, CanPro claims that the volume of visitors "exceeds what was reasonably expected by CanPro based on communications with the GSA and/or SSA prior to entering into the lease." Id. ¶ 33.  According to CanPro, had the GSA disclosed the actual expected number of visitors, CanPro would not have entered into the lease.  Id. ¶ 56, 80, 98.  Ultimately, CanPro asserts that the GSA breached the lease, and advances the following claims for relief:

- Count I:  breach of contract—superior knowledge, id. ¶¶ 42-59;

- Count II:  breach of contract—mutual mistake, id. ¶¶ 60-70;

- Count III:  breach of contract—misrepresentation and/or concealment, id. ¶¶ 71-83;

- Count IV:  breach of the implied duty of good faith and fair dealing, id. ¶¶ 84-101;

- Count V:  breach of contract—impossibility of performance, id. ¶¶ 102-07;

- Count VI:  breach of contract—commercial impracticability, id. ¶¶ 108-13; and

- Count VII:  restitution for frustration of purpose, id. ¶¶ 114-16.

CanPro seeks damages of $250,000 and rescission or termination of the lease.  Id. at 18.

Defendant moves to dismiss CanPro's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  Defendant initially argues that the court lacks subject matter jurisdiction over CanPro's claims because CanPro failed to give the contracting officer adequate notice of the basis and amount of its claims.  Def.'s Mot. to Dismiss 2.  It further argues that because CanPro lacks a contractual basis for its claims, it is "attempting to assert tort claims outside this Court's jurisdiction."  Id. at 18.  Alternatively, defendant contends that CanPro does not state a claim upon which this court can grant relief because it (1) fails to identify a contractual duty that was breached; (2) does not plead mistake with particularity, as required by RCFC 9(b); (3) does not identify the contractual provisions upon which its claims are based, in violation of RCFC 9(k); and (4) advances theories that are "fatally flawed in their legal premises, unsupported, and destined to fail."  Id. at 2-3, 20.  Defendant's motion is fully briefed, and the court deems oral argument unnecessary.

## II.  DEFENDANT'S RCFC 12(b)(1) MOTION TO DISMISS

### A.  Standard of Review

In determining whether subject matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  With respect to a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject matter jurisdiction.  Id.  If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject matter jurisdiction to entertain a plaintiff's claims.  Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014).  If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

**B.  Subject Matter Jurisdiction**

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) (explaining that subject matter jurisdiction cannot be forfeited or waived because it "involves a court's power to hear a case" (citing United States v. Cotton, 535 U.S. 625, 630 (2002))); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999) ("[A] federal court [must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."), quoted in Hymas v. United States, 810 F.3d 1312, 1316-17 (Fed. Cir. 2016); Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868).  Either party, or the court sua sponte, may challenge the court's subject matter jurisdiction at any time.  Arbaugh, 546 U.S. at 506.

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2012).  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

**C.  The Court Lacks Jurisdiction to Entertain Claims That Were Not Submitted to the Contracting Officer**

Plaintiff asserts jurisdiction under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109, which is a "money-mandating source of law sufficient to confer jurisdiction in [the Court of Federal Claims] under the Tucker Act."  Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 168, 171 (2014); accord 28 U.S.C. § 1491(a)(2) (providing jurisdiction in the Court of Federal Claims to hear disputes arising under the CDA).  The CDA applies to disputes concerning federal government procurement contracts, including leases of real property.  41 U.S.C. § 7102(a)(1); accord Wesleyan Co., Inc. v. Harvey, 454 F.3d 1375, 1378 (Fed. Cir. 2006) (defining procurement as the "acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government" (internal quotation marks omitted)); see also Compl. Ex. A at 102 ("This contract is subject to the [CDA].").

Under the CDA, jurisdiction in the Court of Federal Claims "requires both that a claim meeting certain requirements have been submitted to the relevant contracting officer and that the contracting officer have issued a final decision on that claim." K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005 (Fed. Cir. 2015); accord Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1112 (Fed. Cir. 2013) ("If a purported claim is found to be insufficient for any reason, the insufficiency is fatal to jurisdiction under the CDA."); see also 41 U.S.C. § 7103 (setting forth the requirements for submitting claims to the contracting officer, including the need to certify claims exceeding $100,000; Compl. Ex. A at 103 (same). In addition, the court only has "jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision." K-Con Bldg. Sys., 778 F.3d at 1005 (internal quotation marks omitted); accord 41 U.S.C. § 7104; Arctic Slope Native Ass'n, Ltd. v. Sebelius, 583 F.3d 785, 793 (Fed. Cir. 2009) ("[T]he timely submission of a claim to a contracting officer is a necessary predicate to the exercise of jurisdiction by a court . . . over a contract dispute governed by the CDA.").

Further, the court possesses jurisdiction to entertain a particular claim set forth in a complaint only if that same claim was first presented to the contracting officer. See Kellogg Brown, 115 Fed. Cl. at 183 ("[T]he law is clear that 'the same claim must be presented to the Court of Federal Claims as was decided by the contracting officer.'" (quoting Ace Constructors, Inc. v. United States, 499 F.3d 1357, 1361 (Fed. Cir. 2007))). The parties do not dispute that the lease is governed by the CDA, that CanPro timely submitted a certified claim to the GSA contracting officer, and that this action was timely filed after the claim was denied. Therefore, the court's task is limited to determining whether the claims set forth in CanPro's complaint were first presented to the contracting officer.

### D. CanPro Failed to Submit All of Its Claims to the GSA Contracting Officer

Claims asserted in the Court of Federal Claims that "arise from the same operative facts" and seek "essentially the same relief" will be deemed to be the same claims as those previously submitted to the contracting officer, even if "differing legal theories for that recovery" are presented; claimants need not precisely follow the "exact language or structure of the original administrative CDA claim." Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003). In other words, contracting officers need only have "an ample pre-suit opportunity" to decide claims "knowing at least the relief sought and what substantive issues are raised." K-Con Bldg. Sys., 778 F.3d at 1006.

While simply adjusting the amount of damages based on the evidence developed during litigation does not create a separate claim, courts have "differentiated claims seeking different types of remedy, such as expectation damages versus consequential damages." Id. Similarly, a "materially different" fact pattern "create[s] a different claim," whereas "merely adding factual details or legal argumentation does not create a different claim." Id. In other words, demands submitted to the contracting officer should be treated as separate claims "if they either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally." Id. at 1005. The court must evaluate whether jurisdiction lies for each separate claim, rather than the entire case as a whole. Id.

### 1. Superior Knowledge

Throughout its complaint, CanPro alleges that during lease negotiations, the GSA and/or the SSA failed to disclose information in their possession pertaining to the SSA's expected visitor volume at One Park Place.  The doctrine of superior knowledge "imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000), quoted in Scott Timber Co. v. United States, 692 F.3d 1365, 1373 (Fed. Cir. 2012); accord AT&T Commc'ns, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002) ("[T]he government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor.").

Count I of CanPro's complaint is a breach-of-contract claim based on superior knowledge, Count IV is a claim for breach of the implied duty of good faith and fair dealing, and Count VII is a claim for restitution for frustration of purpose.  In Count I and part of Count IV, CanPro alleges that, during lease negotiations, the SSA and/or the GSA possessed information regarding the expected SSA visitor volume that they did not share with CanPro even after being asked for such information.  CanPro described the "misstatements and/or omissions of fact" as being "material in nature" and "intentional."  Compl. ¶¶ 51-52, 93-94.  In part of Count VII, CanPro alleges that the SSA's and/or the GSA's "deliberate failure to disclose" the expected volume of SSA visitors to One Park Place entitled it to damages.  Id. ¶ 115.  CanPro also alleges, in all counts, that the "GSA knew or should have known that the expected volume of visitors to the SSA [at One Park Place] would exceed 250 [daily]" and that the "GSA failed to disclose" this information to CanPro during lease negotiations.  Id. ¶¶ 18-19.

In its certified claim submitted to the GSA contracting officer, CanPro based its demand for relief on its assertion that both CanPro and the GSA had the same understanding regarding the expected SSA visitor volume during lease negotiations, as well as on the "SSA's conduct and manner of conducting business" at One Park Place since occupying the premises.  Pl.'s App. 5, 8.  Nowhere in its certified claim did CanPro contend that the GSA knew, during lease negotiations, that the number of daily visitors to the SSA office at One Park Place would be more than 250, nor did CanPro allude to any failure of the SSA or the GSA to disclose that information during lease negotiations.

The relevant issue, therefore, is the expected number of SSA visitors to One Park Place.  Other events are only pertinent to the extent that they impact the SSA visitor volume.  In its complaint, CanPro alleges that the GSA was aware of pending SSA office closings in the surrounding area.   To the extent that CanPro's certified claim included an allegation that the GSA and/or the SSA were aware of pending SSA office closings in the surrounding area that were not disclosed to CanPro during lease negotiations, CanPro never suggested that such closures impacted the GSA's or the SSA's expectations concerning the SSA visitor volume to One Park Place; rather, CanPro emphasized that all parties, in that regard, shared the same belief.  At most, CanPro averred in its certified claim that the GSA and/or the SSA were mistaken concerning the anticipated SSA visitor volume.  See infra Parts II.E.1-2.  Thus, CanPro's allegations in Count I and parts of Counts IV and VII regarding superior knowledge were not first presented to the contracting officer.

## 2. Impossibility of Performance

In addition to asserting breach-of-contact claims based on the theories of superior knowledge, misrepresentation, and concealment, CanPro alleges in Count V of its complaint that it is "impossible for [CanPro] to meet its obligations under the Lease" due to the excessive number of daily visitors to the SSA office at One Park Place. Compl. ¶ 104. The court recognizes that "the doctrine of impossibility does not require a showing of actual or literal impossibility of performance but only a showing of commercial impracticability." Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002), quoted in Klamath Irrigation Dist. v. United States, 635 F.3d 505, 522 (Fed. Cir. 2011). The court nevertheless construes the "impossible" characterization as literal impossibility because CanPro separately asserts a claim of commercial impracticability in Count VI of its complaint.

In its certified claim to the GSA contracting officer, CanPro described the additional costs, lost opportunities, and other "irreparable harm" incurred as a result of the daily SSA visitor traffic. However, nowhere in its certified claim did CanPro allege—nor can any of the assertions in the certified claim be construed as such—that performing the lease was impossible, as CanPro contends in Count V of the complaint. Thus, the allegations in Count V regarding impossibility of performance were not first presented to the contracting officer.

## 3. Summary

CanPro's breach-of-contract claims based on the theories of superior knowledge and impossibility of performance were not submitted to the GSA contracting officer. Therefore, this court lacks jurisdiction to entertain Counts I and V, and parts of Counts IV and VII, of CanPro's complaint.

## E. CanPro Submitted the Remainder of Its Claims to the GSA Contracting Officer

Unlike the breach-of-contract claims based on the theories of superior knowledge and impossibility of performance asserted by CanPro in its complaint, the breach-of-contract claims based on the theories of mutual mistake, misrepresentation and/or concealment, and commercial impracticability asserted by CanPro in Counts II and VI, and parts of Counts IV and VII, of its complaint were submitted to the GSA contracting officer. Moreover, CanPro has properly pled those claims in this court.

## 1. Mutual Mistake

Count II of CanPro's complaint is a breach-of-contract claim based on CanPro and the GSA having made a mutual mistake during lease negotiations regarding the expected number of daily visitors to the SSA office at One Park Place. Specifically, CanPro alleges that the parties "entered into the lease under the belief that, inter alia, the volume of SSA visitors to [One Park Place] would not exceed 250 at peak times throughout an entire day of operation" and that "[t]he estimate later proved grossly erroneous." Compl. ¶¶ 62-63. Similarly, CanPro based its certified claim submitted to the GSA contracting officer on the averment that while "all parties" believed

that the SSA would receive no more than 250 daily visitors, the actual amount of daily visitors turned out to be much higher.  Pl.'s App. 5.  Claimants need only "give[] the contracting officer adequate notice of the basis and amount of the claim."  K-Con Bldg. Sys., 778 F.3d at 1005 (internal quotation marks omitted).  In other words, CanPro's certified claim put the GSA contracting officer on notice of the "substantive issues," id. at 1006, involved in Count II of the complaint such that the GSA contracting officer had sufficient information to render an informed decision.

## 2. Misrepresentation and/or Concealment

CanPro also alleges that the GSA and/or the SSA misrepresented and/or concealed the anticipated number of visitors to the SSA's office.  Misrepresentation in the inducement of a contract can form the basis of a breach-of-contract claim.  Kenney Orthopedic, LLC v. United States, 107 Fed. Cl. 85, 91 (2012).

Count III of CanPro's complaint is a breach-of-contract claim based on the theory of misrepresentation and/or concealment, and as previously noted, Count IV is a claim for breach of the implied duty of good faith and fair dealing, and Count VII is a claim for restitution for frustration of purpose.  In Count III, CanPro alleges that "Defendant made material misrepresentations and/or concealed information as to the expected volume of SSA visitors to the Lease Premises prior to the parties entering into the Lease" and that the SSA and/or the GSA engaged in "concealment of SSA office closings in the areas surrounding the Leased Premises." Compl. ¶¶ 74-75.  Such actions led CanPro to "enter[] into the Lease with an understanding that, inter alia, the volume of SSA visitors to the Leased Premises would not exceed 250 at peak times throughout an entire day of operation."  Id. ¶ 78.  In part of Count IV, CanPro alleges that, during lease negotiations, the SSA and/or the GSA possessed information regarding the expected SSA visitor volume that they did not share with CanPro even after being asked for it.  CanPro describes these "omissions of fact" as being "material in nature" and "intentional."  Id. ¶¶ 93-94. In part of Count VII, CanPro alleges that the SSA's and/or the GSA's "deliberate failure to disclose" vital information entitles it to damages.  Id. ¶ 115.

As stated above, CanPro's certified claim was premised on the assertion that both CanPro and the GSA had the same understanding regarding the expected SSA visitor volume during lease negotiations, but that the "SSA's conduct and manner of conducting business" at One Park Place since occupying the premises included "accommodating upwards of 500 [daily visitors]." Pl.'s App. 5, 8-9.  CanPro repeatedly referred to the "maximum of 200-250 [daily visitors] which was originally intended," id. at 25, explaining that this figure "was presented to [CanPro] during the . . . discussions" that took place prior to the execution of the lease, id. at 27-28.  In its certified claim, CanPro also referred to the fact that a nearby SSA office had closed.  Id. at 25. Thus, CanPro's certified claim put the GSA contracting officer on notice of the allegations that the expected visitor volume and nearby SSA office closings were misrepresented to CanPro during lease negotiations.

### 3. Commercial Impracticability

Count VI of the complaint is a breach-of-contract claim based on impracticability of performance, and, as previously noted, Count IV is a claim for breach of the implied duty of good faith and fair dealing, and Count VII is a claim for restitution for frustration of purpose.  In Count VI, CanPro alleges that the SSA's use of One Park Place is "unreasonable and beyond [its] intended use," resulting in "extreme hardship and actual and future irreparable injury, loss, and damages" and "rendering the Lease commercially impracticable."  Compl. ¶¶ 110-11, 113.  In part of Count IV, CanPro alleges that the SSA's use of One Park Place is "unreasonable and beyond the intended use" contemplated in the lease, thus "hindering [CanPro's] ability to perform" its obligations thereunder.  Id. ¶ 86.  In part of Count VII, CanPro alleges that the SSA's failure to "limit and/or control the volume and conduct of its [visitors]" deprived CanPro "of the benefit of its bargain."  Id. ¶ 115.

In its certified claim submitted to the GSA contracting officer, CanPro asserted that "the daily influx of [the] SSA's invitees has massively exceeded a reasonable number" and detailed a litany of consequences resulting from "[the] SSA's activities and failure to moderate the number of visitors each day."  Pl.'s App. 5, 7.  CanPro further described the "SSA's conduct and manner of conducting business" as "injurious to [its] person and property . . . and totally beyond any reasonable use of the premises," noting that the "ongoing injurious situation" has caused CanPro to "suffer irreparable harm caused by the GSA and SSA."  Id. at 8-10.  CanPro specifically referred to the "covenant of reasonable use" in its certified claim, and highlighted the "numerous correspondences" it had previously sent in an attempt to rectify the situation.  Id. at 9.  Thus, CanPro's certified claim put the GSA contracting officer on notice of the allegations that the SSA's use of One Park Place was unreasonable and beyond the use intended by the parties, allegations that form the basis of Count VI, and parts of Counts IV and VII, of the complaint.

### 4. RCFC 9(k)

Even when a plaintiff properly submits a claim to the contracting officer prior to filing suit, the court cannot exercise its jurisdiction unless the plaintiff satisfies the pleading requirements set forth in RCFC 9(k).[6]  See, e.g., Baha v. United States, 123 Fed. Cl. 1, 5 n.4 (2015) ("Satisfaction of RCFC 9(k) is a jurisdictional requirement."); see also Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. 760, 766 (2014) ("If a plaintiff fails to comply with RCFC 9(k) and to allege sufficient facts to show that it had a contract with the United States, the court cannot exercise jurisdiction over the claim."); Kissi v. United States, 102 Fed. Cl. 31, 35 (2011) (finding no jurisdiction based on the plaintiff's failure to show an existing contract and failure to "adequately plead a contract claim under RCFC 9(k)").  RCFC 9(k) requires a party, "[i]n pleading a claim founded on a contract," to "identify the substantive provisions of the contract . . . on which the party relies."  A plaintiff that attaches a copy of the

---

[6]  A plaintiff must also allege the existence of a contract with the United States to establish the court's subject matter jurisdiction.  See Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (requiring a "non-frivolous allegation of a contract with the government" to establish jurisdiction under 28 U.S.C. § 1491(a)(1)).  CanPro sufficiently alleges, and the parties do not dispute, the existence of a valid contract.  See infra Part III.F.1.

contract to the complaint and "identif[ies] the provisions and terms of the contract that have been breached" satisfies its burden under RCFC 9(k) because doing so allows the court to "render a decision . . . know[ing] the relevant terms of the contract." Garreaux v. United States, 77 Fed. Cl. 726, 730 (2007), quoted in Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 715 (2010).

CanPro fulfilled the RCFC 9(k) pleading requirement by including the lease as an exhibit attached to the complaint and making appropriate references thereto. The relevant substantive provisions of the lease are the "normal and customary use" provision, Compl. Ex. A at 39, and the office specifications, id. at 8, 12. CanPro's repeated references to the SSA's unreasonable use of its leased space at One Park Place throughout the complaint necessarily implicate both the "normal and customary use" provision as well as the implied duty of good faith and fair dealing. See infra Part III.F.2. In addition, CanPro's allegations regarding the parties' mistaken belief regarding the volume of SSA visitors to One Park Place, misrepresentation and/or concealment by the GSA and/or the SSA, and commercial impracticability implicate both the "normal and customary use" provision and the SSA office specifications, because those provisions of the lease tend to reflect that there is a limitation on the building capacity at One Park Place. Therefore, CanPro meets its pleading requirements under RCFC 9(k) because its references to the lease, which was attached to the complaint, are sufficient to apprise the court of the relevant contract provisions.

### 5. Summary

CanPro's claims based on mutual mistake, misrepresentation and/or concealment, and commercial impracticability were submitted to the GSA contracting officer, and CanPro satisfied the pleading requirements of RCFC 9(k). CanPro's claims based on misrepresentation and/or concealment do not sound in tort because they allegedly took place in the inducement of the lease. Therefore, this court has jurisdiction to entertain Counts II, III, and VI of CanPro's complaint, as well as those portions of Counts IV and VII containing allegations of the SSA's misrepresentation, concealment, and unreasonable use of the leased premises at One Park Place.

### F. CanPro Sought Money Damages and Contract Termination, but Not Rescission, Before the GSA Contracting Officer

In addition to comparing claims submitted to the contracting officer with the claims asserted in the complaint, the court must examine the types of remedies sought. See K-Con Bldg. Sys., 778 F.3d at 1005-06. The court has no jurisdiction over types of relief requested in the complaint that were not previously sought from the contracting officer. See Kellogg Brown, 115 Fed. Cl. at 183 (drawing a distinction between "fundamentally different" types of relief sought and explaining that "the law is clear that 'the same claim must be presented to the Court of Federal Claims as was decided by the contracting officer'" (quoting Ace Constructors, 499 F.3d at 1361)).

In its certified claim, CanPro demanded $250,000 in damages, termination of the lease, and alternative dispute resolution by mediation. In its complaint, CanPro requests $250,000 in

damages as well as rescission and/or termination of the lease.[7] Defendant argues that rescission and contract termination are entirely different equitable remedies and that, therefore, CanPro cannot now seek rescission in this court.

"Rescission has the effect of voiding a contract from its inception, i.e., as if it never existed." Dow Chem. Co. v. United States, 226 F.3d 1334, 1345 (Fed. Cir. 2000). It is "essentially an equitable remedy [and] will not ordinarily be invoked where money damages—in this case damages for breach of contract—will adequately compensate a party to the contract." Id. Unlike rescission, contract termination is a remedy generally available under a termination provision in a contract following a material breach by the other contracting party. Id. at 1346; see also McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999) (explaining that a party can choose to terminate a contract upon default by the other party and discussing the government's ability to terminate for convenience); Compl. Ex. A at 90 (allowing the government to terminate the lease for default and recover damages). Thus, defendant's observation that rescission and contract termination are different remedies is correct. Accord Restatement (Second) of Contracts § 283 cmt. a (Am. Law Inst. 1981) (differentiating between rescission, termination, and cancellation). Thus, because CanPro did not seek rescission before the GSA contracting officer, it cannot seek it now.

In sum, CanPro's claims for $250,000 in damages and termination of the lease were submitted to the GSA contracting officer, while CanPro's claim for rescission of the lease was not submitted to the GSA contracting officer. Since claims for contract termination are within this court's jurisdiction, the court can entertain CanPro's claims for $250,000 and termination of the lease. The court is precluded, however, from entertaining CanPro's claim for rescission of the lease.

## III. DEFENDANT'S RCFC 12(b)(6) MOTION TO DISMISS

### A. Standard of Review

In the alternative, defendant moves to dismiss CanPro's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which this court can grant relief, contending that

---

[7] With some exceptions not relevant to the case at bar, the Court of Federal Claims generally lacks the ability to award equitable relief.[7] See Bowen v. Massachusetts, 487 U.S. 879, 905 (1988) (holding that the Court of Federal Claims lacks the "general equitable powers of a district court to grant prospective relief"); Brown v. United States, 105 F.3d 621, 624 (Fed. Cir. 1997) (holding that the Tucker Act does not provide independent relief through declaratory or injunctive judgments); Stephanatos v. United States, 81 Fed. Cl. 440, 445 (2008) (explaining that the court "has no authority to grant equitable relief 'unless it is tied and subordinate to a money judgment'" (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998))). However, although contract termination is a form of equitable relief, see, e.g., Higbie v. United States, 778 F.3d 990, 997 (Fed. Cir. 2015) (distinguishing between "monetary damages" and "equitable relief"), a "dispute concerning termination of a contract" is specifically within the jurisdiction of the Court of Federal Claims, 28 U.S.C. § 1491(a)(2).

(1) CanPro failed to allege mistake, misrepresentation, and breach of contract with particularity;[8] (2) CanPro's complaint "is fatally flawed in its legal premises and destined to fail," Def.'s Mot. to Dismiss 20 (internal quotation marks omitted); and (3) CanPro does not allege a causal connection between the alleged breaches and claimed damages.  To survive an RCFC 12(b)(6) motion to dismiss, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face" sufficient for the defendant to have "fair notice" of the claim and the "grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  In ruling on such a motion, the court must "accept as true all of the factual allegations contained in the complaint" and any attachments thereto.  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citing Twombly, 550 U.S. at 555-56); accord RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Rocky Mountain, 841 F.3d at 1325 (applying RCFC 10(c) and emphasizing that "a court 'must consider the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice'" (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007))).

The issue at this stage of litigation is not the sufficiency of the United States' potential defenses or the likelihood of CanPro's eventual success on the merits of its claim, but simply whether CanPro has alleged specific facts describing a plausible claim for relief.  See Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) ("The court must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974))).

### B. CanPro Fails to State a Plausible Claim for Relief Based on Mutual Mistake

To prevail on a claim of mutual mistake, a party to a contract must show that

> (1) both parties were mistaken in their belief regarding a fact existing at the time of contracting, (2) the mistaken belief constituted a basic assumption on which the contract was made, (3) the mistake had a material effect on the bargain, and (4) the contract did not place the risk of mistake on the party seeking relief.

Griffin & Griffin Expl., LLC v. United States, 116 Fed. Cl. 163, 175 (2014) (citing Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)).  CanPro contends that although the parties executed the lease based on the shared belief that the volume of SSA visitors to One Park Place would not exceed 250 per day during peak periods, that "estimate later proved grossly

---

[8]  Defendant mischaracterizes a failure to comply with RCFC 9(k) as a ground for dismissal under RCFC 12(b)(6) rather than RCFC 12(b)(1).  See supra Part II.E.4 (explaining that RCFC 9(k) is a jurisdictional requirement).  However, since CanPro met its burden thereunder, id., the distinction is immaterial to resolving defendant's motion to dismiss.

erroneous." Compl. ¶ 63.  In other words, CanPro alleges that both parties were "mistaken in their belief" regarding a fact—i.e., the "expected volume of SSA visitors"—that existed at the time the lease was executed.  Id. ¶ 64.  CanPro also contends that the lease was executed for the "specific purpose" of the "business operations of SSA consistent with the understanding of the parties regarding expected SSA visitors."  Id. ¶ 23.  In other words, CanPro alleges that the parties' mistaken belief regarding the expected volume of SSA visitors was a "basic assumption underlying the Lease."  Id. ¶ 65.  Further, CanPro asserts that it has "incurred operating and other expenses as a direct result of the excessive volume of SSA visitors" that exceed its rent collected.  Id. ¶ 67.  In other words, CanPro alleges that the "mistaken belief had a material effect on the Lease."  Id. ¶ 66.  Finally, CanPro states that it "is not responsible for the gross inaccuracy" of the mistaken belief because it was "provided by" the GSA.  Id. ¶ 68.  In other words, CanPro alleges that the lease does not place risk of an inaccurate estimate regarding the expected SSA visitor volume upon CanPro.

CanPro's theory of mutual mistake relies entirely on the expected number of daily visitors to the SSA office at One Park Place.  However, a mistake is an "erroneous belief [relating] to the facts as they exist at the time of the making of the contract."  Restatement (Second) of Contracts, supra, at § 151 cmt. a (emphasis added).  A "prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake as that word is defined [under the doctrine of mutual mistake]."  Lakeshore Eng'g Servs., Inc. v. United States, 748 F.3d 1341, 1350 (Fed. Cir. 2014) (internal quotation marks omitted).  In other words, "mutual mistake of fact cannot lie against a future event."  Dairyland Power Co-op v. United States, 16 F.3d 1197, 1203 (Fed. Cir. 1994) (collecting cases).  In this case, the "expected volume" of daily SSA visitors, Compl. ¶¶ 64, 65, 68, 69, is a "prediction or judgment" concerning a "future event" and thus cannot be the subject of a mutual mistake of fact.[9]  Therefore, CanPro cannot state a plausible claim for relief based on mutual mistake.

Furthermore, assuming that the parties' belief regarding the expected volume of daily SSA visitors at the time of lease execution could be the basis of a claim of mutual mistake and that the lease did not place the risk of such a mutual mistake upon CanPro, a party "cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where . . . the 'mistake' is a result of that party's failure to exercise due diligence."  Griffin, 116 Fed. Cl. at 175.  In other words, "[i]gnorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence.  He who averts knowledge to himself cannot later claim lack of knowledge."  Id. (internal quotation marks omitted); see also Restatement (Second) of Contracts, supra, at § 154 cmt. c ("Even though the mistaken party did not agree to bear the risk, [it] may have been aware when [it] made the contract that [its] knowledge with respect to the facts to which the mistake relates was limited.  If

---

[9]  Unlike a prediction regarding the future volume of visitors, an existing plan to accommodate a particular visitor volume would be a fact that could be the subject of a mutual mistake.  See, e.g., Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 675 (1994) (holding that a planned future renovation was a fact).  However, CanPro did not characterize the alleged mutually held belief that the volume of SSA visitors would not exceed 250 per day during peak times as any sort of a plan, but rather as a "belief" and an "estimate" that only "later proved grossly erroneous."  Compl. ¶¶ 62-66, 69.

[the party] was not only so aware that [its] knowledge was limited but undertook to perform in the face of that awareness, [that party] bears the risk of the mistake.").

Here, CanPro alleges that (1) it "reasonably relied on the GSA and/or SSA . . . to provide all material information relating to the Lease," Compl. ¶ 38; (2) the GSA "failed to disclose" the expected volume of SSA visitors during the lease negotiations, id. ¶ 19; (3) it "inquired regarding the expected volume of visitors to the SSA" at One Park Place, id. ¶ 15, but those inquiries were not answered; and (4) the GSA "never provided the material information necessary for [CanPro] to adequately determine the expected volume of SSA visitors and therefore accurately project the viability of SSA occupancy" at One Park Place, id. ¶ 91. In other words, CanPro proclaims that it never received the information it requested and that it knew was needed to develop an informed belief concerning the expected volume of SSA visitors to One Park Place, but that it nonetheless executed the lease. Assuming that CanPro's reliance on the GSA and/or the SSA to "provide all material information" during lease negotiations was reasonable, id. ¶ 38, CanPro's execution of the lease in light of its admitted lack of knowledge concerning what it deems a "basic assumption" regarding the lease, id. ¶ 65, constitutes a failure to exercise due diligence and thus places the risk of a mistake resulting from such lack of knowledge squarely on CanPro.[10]

In sum, CanPro has failed to establish a plausible claim for relief based on mutual mistake. Therefore, the court must dismiss Count II of CanPro's complaint.

## C. CanPro Fails to State a Plausible Claim for Relief Based on Misrepresentation and/or Concealment

In addition to asserting a claim based on mutual mistake, CanPro also advances a claim for misrepresentation and/or concealment. To prevail on a claim of misrepresentation, a plaintiff "must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." AT&T Commc'ns, 296 F.3d at 1312 (internal quotation marks omitted). A material misrepresentation is one that "would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Id. (internal quotation marks omitted). Unlike fraud, misrepresentation "does not require an intent to deceive." First Interstate Bank of Billings v. United States, 61 F.3d 876, 880 (Fed. Cir. 1995). It merely requires "an assertion that is not in accord with the facts." Restatement (Second) of Contracts, supra, at § 159, quoted in Fed. Grp., Inc. v. United States, 67 Fed. Cl. 87, 102 (2005). Although "intended to be truthful," an assertion "may be a misrepresentation because of ignorance or carelessness." Restatement (Second) of Contracts, supra, at § 159 cmt. a. Concealment is "an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have

---

[10] A claim based on unilateral mistake would fail for the same reason, i.e., that CanPro is deemed to have assumed the risk of such a mistake. See, e.g., Johnson Mgmt. Grp. CFC, Inc. v. Martinez, 308 F.3d 1245, 1260 (Fed. Cir. 2002) (explaining that a unilateral mistake gives rise to a remedy "if the mistaken party does not bear the risk of the mistake" and other requirements are satisfied).

learned." Id. § 160 cmt. a.  It is "always equivalent to a misrepresentation and has any effect that a misrepresentation would have." Id.

CanPro asserts that, during lease negotiations, the "GSA and/or SSA assured [it] that the expected volume of SSA visitors during peak times would be no greater than 250 visitors throughout the day" but that "visitors to the SSA's offices regularly exceed[] 350 to 700 persons daily." Compl. ¶¶ 16, 24.  In other words, CanPro alleges an erroneous representation of fact by defendant.  Further, CanPro contends that "[t]he parties signed the Lease with the specific purpose of utilizing the Leased Premises for the business operations of SSA consistent with the understanding of the parties regarding expected SSA visitors." Id. ¶ 23.  In other words, CanPro alleges that the fact—i.e., the "expected volume of SSA visitors to the Leased Premises," id. ¶¶ 74, 77—was "material in nature," id. ¶ 77.  Finally, CanPro argues that it "relied on the Defendant's representations . . . that, inter alia, the volume of SSA visitors to the Leased Premises would not exceed 250 [daily]." Id. ¶ 78.  In other words, CanPro alleges that it honestly and reasonably relied on defendant's representations.

In addition, CanPro avers that the "GSA knew or should have known that the expected volume of visitors to the SSA [at One Park Place] would exceed 250 [daily]" and that the "GSA failed to disclose" this information to CanPro during lease negotiations. Id. ¶¶ 18-19.  CanPro also avers that "the GSA knew or should have known that the SSA had expected temporary and/or permanent office closings in the area surrounding the Leased Premises" and that "the GSA failed to disclose" such information during lease negotiations. Id. ¶¶ 17, 19.  In other words, CanPro alleges that the GSA acted affirmatively to keep it from learning material facts.

CanPro fails, however, to recognize that an assertion "limited to future events" may not form the basis for a misrepresentation claim. Fed. Grp., 67 Fed. Cl. at 102.  "An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation, not to future events." Id. (internal quotation marks omitted).  Although a "statement of intention" can be a misrepresentation, the statement "must be false at the time made." Id.  In this case, the "expected volume of SSA visitors" to One Park Place, Compl. ¶¶ 74, 77, is a "future event" and thus cannot support a misrepresentation claim.[11]

Furthermore, CanPro's concealment argument fails because "[n]on-disclosure [of a fact]" only amounts to a misrepresentation under the same circumstances as a misrepresentation. Restatement (Second) of Contracts, supra, at § 160 cmt. a.  In other words, the concealed fact must be material, must be reasonably relied upon, and cannot be an assertion limited to a future event.  Although defendant's plan to close other SSA offices in the surrounding area was in place

---

[11]   The court notes the distinction between the GSA's and/or the SSA's understandings concerning the expected daily SSA visitor volume at One Park Place, which is a future event, and the GSA's and/or the SSA's representation of their understandings, which is a statement regarding a current state of mind. Cf. supra Part III.B & n.9.  To constitute a misrepresentation, the GSA and/or the SSA must have falsely stated their understandings during lease negotiations, rather than having correctly stated an understanding that later turned out to be false. See Fed. Grp., 67 Fed. Cl. at 102.  CanPro did not allege any such misrepresentation in its certified claim before the GSA contracting officer.

at the time the lease was executed and therefore is a "fact [existing] at the time," <u>Fed. Grp.</u>, 67 Fed. Cl. at 102, such plans are material only to the extent of their impact on the expected SSA visitor volume.  Since, as explained above, the expected SSA visitor volume cannot support a misrepresentation claim, allegations concerning plans to close other SSA offices in the surrounding area plans cannot support an equivalent concealment claim.

In sum, CanPro has failed to establish a plausible claim for relief based on misrepresentation and/or concealment.  Therefore, the court must dismiss Count III of CanPro's complaint, and parts of Counts IV and VII, for failure to state a claim upon which this court can grant relief.

### D.  CanPro Fails to State a Plausible Claim for Relief Based on Impracticability of Performance

The court next addresses CanPro's claim that its performance under the lease is commercially impracticable.  Although commercial impracticability is a factual inquiry, its resolution is ultimately a legal issue.  <u>Seaboard Lumber</u>, 308 F.3d at 1292.  Under the doctrine of commercial impracticability, a promissor is excused from performing a contractual duty when "a supervening event changes the nature of the promissor's performance so that it has become commercially impracticable."[12]  <u>Id.</u> at 1296; <u>accord</u> Restatement (Second) of Contracts, <u>supra</u>, at § 261 cmt. a. (explaining that a party may be relieved of a contractual duty if "performance has unexpectedly become impracticable as a result of a supervening event").  The analysis of a commercial impracticability argument thus focuses on "the nature of the event and its effect upon performance."  <u>Seaboard Lumber</u>, 308 F.3d at 1296.  In addition, the nonoccurrence of that event must have been a basic assumption underlying the formation of the contract.  Restatement (Second) of Contracts, <u>supra</u>, at § 261 cmt. b.

Finally, "[a] contract is commercially impracticable when performance would cause 'extreme and unreasonable difficulty, expense, injury, or loss to one of the parties.'"  <u>Raytheon Co. v. White</u>, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts, <u>supra</u>, at § 261 cmt. d).  Increased costs alone, however, do not necessarily establish commercial impracticability.  <u>See, e.g.</u>, <u>Raytheon</u>, 305 F.3d at 1368 (comparing cases where a 70% cost overrun was held not commercially impracticable, but a 148% cost overrun that extended the contract from seven months to four years entitled the contractor to relief).  In essence, the commercial impracticability doctrine applies when there are "substantial unforeseen costs" that

---

[12]  Commercial impracticability can also apply "[w]here, at the time a contract is made, a party's performance under it is impracticable without [its] fault because of a fact of which [it] has no reason to know and the non-existence of which is a basic assumption on which the contract is made."  Restatement (Second) of Contracts, <u>supra</u>, at § 266(1).  However, since a prediction or judgment concerning a future event is not a fact that exists at the time of contracting, <u>see</u> <u>supra</u> Parts III.B, CanPro cannot use an estimate regarding the expected volume of future visitors to the SSA office at One Park Place as the underlying unknown fact to support an impracticability claim.  Thus, CanPro's only avenue for pursuing a breach-of-contract claim based on commercial impracticability is by showing the occurrence of a supervening event.

entitle the contractor to an equitable adjustment to the contract.  Ace Constructors, 499 F.3d at 1364.

CanPro asserts that the unexpected visitor volume at the SSA office at One Park Place caused it to "suffer extreme hardship" and incur "substantial damages" and "great expense." Compl. ¶¶ 32, 112-13.  In other words, it alleges an event resulting in extreme, unreasonable, and substantial increased costs.  However, CanPro's invocation of the commercial impracticability doctrine is misplaced because the doctrine is intended for use as a defense to a breach-of-contract claim for nonperformance, not as a theory to be used in pursuit of an affirmative remedy.  See, e.g., Raytheon, 305 F.3d at 1367 ("A finding of impracticability excuses a party from performing unless the party has assumed the risk of the event." (emphasis added)); Hercules Inc. v. United States, 24 F.3d 188, 204 (Fed. Cir. 1994) (stating that commercial impracticability "excuses delay or nonperformance of a contract"); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 150 (2002) (explaining that impracticability "do[es] not apply" to breach-of-contract claims); Restatement (Second) of Contracts, supra, at § 261 cmt. a (stating that impracticability due to a supervening event "applies only to discharge a duty to render performance and does not affect a claim for breach").

Moreover, CanPro contends that the "excessive" volume of SSA visitors is caused by the SSA's "deliberate failure to limit and/or control" their number.  Compl. ¶¶ 110, 112.  CanPro also places responsibility for the damages it alleges to have incurred upon the SSA for its "deliberate failure to limit and/or control" the conduct of its visitors.  Id. ¶ 110.  In other words, CanPro argues that performing its obligations under the lease has become impracticable due to the SSA's conduct, not because of a supervening event or changed conditions outside of the parties' control.  This court has previously held that where the alleged impracticability is due to the defendant's conduct, the proper claim is for breach-of-contract and the doctrine of impracticability does not apply.  Westfed, 52 Fed. Cl. at 150; accord Restatement (Second) of Contracts, supra, at § 261 cmt. d (emphasizing that events giving rise to commercial impracticability are generally due to acts of nature or third parties, thus events caused by another party to the contract typically amount to a breach of contract as opposed to impracticability). CanPro's stance therefore renders inapposite its invocation of the doctrine of commercial impracticability.

In sum, CanPro has failed to state a plausible claim for relief based on commercial impracticability.  Therefore, the court must dismiss Count VI of CanPro's complaint.

### E. CanPro Fails to State a Plausible Claim for Relief Based on Frustration of Purpose

CanPro also advances a claim for relief based on the theory of frustration of purpose. While distinct from commercial impracticability, the frustration of purpose doctrine also allows a party to escape liability for breach of contract by showing that its nonperformance was justified. See Seaboard Lumber, 308 F.3d at 1296 (describing frustration of purpose as a "non-performance defense" to a breach-of-contract claim).  It requires a party to establish that "(1) a supervening event occurred that should excuse performance, (2) it did not bear the risk of the

event, and (3) the event rendered the value of the performance worthless to [that party]."[13] Id.
In other words, to successfully invoke the frustration of purpose doctrine, the nonperforming
party must "show that it is excused from performance because the purpose of the contract [is] no
longer served by mutual performance." Nycal Offshore Dev. Corp. v. United States, 743 F.3d
837, 846 (Fed. Cir. 2014). However, performance will not be excused if the contract's language
or the attendant circumstances so indicate. See, e.g., DMS Imaging, Inc. v. United States, 123
Fed. Cl. 645, 658-59 (2015) (stating that the frustration of purpose doctrine was "clearly
inapplicable" when a contractual provision "expressly stated" that the occurrence of a specified
event did not relieve the government of its obligation to make lease payments). "The defense of
frustration of purpose is given a narrow construction because it defeats the explicit terms of the
parties' agreement." Nycal Offshore Dev., 743 F.3d at 846.

CanPro asserts that the SSA failed to "limit and/or control the volume and conduct of its
[visitors]" and that such failure hinders CanPro's ability to meet its obligations under the lease
and frustrates its purpose. Compl. ¶ 115. In other words, CanPro alleges that a supervening
event—the increased volume of SSA visitors—occurred that should excuse its duty to perform.
Further, CanPro contends that the volume of SSA visitors is beyond what was reasonably
expected despite the lease provisions binding the SSA to "normal and customary use" of One
Park Place. Compl. Ex. A at 39. In other words, CanPro alleges that it did not bear the risk of
the event occurring. Finally, CanPro argues that the SSA's failure to limit and/or control its
visitors deprived CanPro of the benefit of its bargain due to the extensive costs CanPro incurred
because of that failure, i.e., that continuing in the lease in light of the volume and behavior of
SSA visitors is not profitable. In other words, CanPro alleges that the event made continued
performance worthless. See, e.g., Seaboard Lumber, 308 F.3d at 1296 (describing the
frustration-of-purposes analysis as being "concerned with the impact of the event upon the
failure of consideration").

However, CanPro is not asserting the frustration of purpose doctrine as a defense to a
breach-of-contract claim asserted by defendant. Rather, it is invoking the doctrine as a means of

---

[13] Frustration of purpose can also apply in situations "'[w]here, at the time a contract is
made, a party's principal purpose is substantially frustrated without [its] fault by a fact of which
[it] has no reason to know and the non-existence of which is a basic assumption on which the
contract is made.'" La Gloria Oil & Gas Co. v. United States, 72 Fed. Cl. 544, 573 (2006)
(quoting Restatement (Second) of Contracts, supra, at § 266(2)), aff'd in part, rev'd in part on
other grounds sub nom. ConocoPhillips v. United States, 501 F.3d 1374 (Fed. Cir. 2007).
However, this rule does not describe the situation at bar because the office space at One Park
Place—the provision of which was the "principal purpose" of the lease—was in no way impaired
at the beginning of the SSA's occupancy. See, e.g., id. (explaining that frustration of purpose
will excuse performance "where, at the time the contract is made, the object of the contract has
been destroyed" (citing Restatement (Second) of Contracts, supra, at § 266, illust. 1)).
Furthermore, since a prediction or judgment concerning a future event is not a fact that exists at
the time of contracting, see supra Part III.B, CanPro cannot use an estimate regarding the
expected volume of future visitors to the SSA office at One Park Place as the underlying
unknown fact to support a frustration of purpose claim. Thus, CanPro's only avenue for
pursuing the frustration of purpose doctrine is by showing the occurrence of a supervening event.

imposing liability on defendant.  Such use is a misapplication of the doctrine.  Frustration of purpose is "a <u>defense</u> to excuse performance" of a contract; it cannot be used in pursuit of an affirmative remedy.  <u>La Gloria Oil & Gas Co.</u>, 72 Fed. Cl. at 573 (emphasis added); <u>accord</u> <u>Nycal Offshore Dev.</u>, 743 F.3d at 846 (characterizing frustration of purpose as a "defense" to a breach-of-contract claim); <u>Seaboard Lumber</u>, 308 F.3d at 1296 (same); <u>Westfed</u>, 52 Fed. Cl. at 150 (explaining that frustration of purpose "do[es] not apply" to breach-of-contract claims).

In sum, CanPro has failed to establish a plausible claim for relief based on frustration of purpose.  Therefore, to the extent that jurisdiction is proper, <u>see</u> <u>supra</u> Parts II.D.1, II.E.2, the court must dismiss Count VII of CanPro's complaint for failure to state a claim upon which this court can grant relief.

### F.  CanPro Has Pled a Plausible Breach-of-Contract Claim

### 1.  Legal Requirements for Breach of Contract

CanPro's sole remaining claim is the portion of Count IV—breach of the implied duty of good faith and fair dealing—in which CanPro alleges that the SSA's use of One Park Place is unreasonable and beyond the use intended by the parties.  The court must determine whether those allegations are sufficient to state a plausible claim for breach of contract, and, more specifically, for breach of the implied duty of good faith and fair dealing.  To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." <u>Century Expl. New Orleans, LLC v. United States</u>, 110 Fed. Cl. 148, 163 (2013) (citing <u>San Carlos Irr. & Drainage Dist. v. United States</u>, 877 F.2d 957, 959 (Fed. Cir. 1989)).  Once a breach of contract is established, the burden shifts to the defendant to plead and prove affirmative defenses that excuse the breach.  <u>Shell Oil Co. v. United States</u>, 751 F.3d 1282, 1297 (Fed. Cir. 2014) (citing <u>Stockton E. Water Dist. v. United States</u>, 583 F.3d 1344, 1360 (Fed. Cir. 2009)).

CanPro asserts that it executed a lease with the GSA on October 22, 2012, for the purpose of housing an SSA office at One Park Place.  In other words, it alleges the existence of a valid contract.  CanPro also asserts that the SSA is required to limit its visitors to 250 per day, control their behavior, and make "normal and customary use of the leased premises during the term of the lease."  Compl. Ex. A at 39.  In addition, CanPro avers that the GSA and the SSA are under an implied duty of good faith and fair dealing.  In other words, CanPro alleges that the GSA and the SSA are subject to a contractual duty.  Further, CanPro contends that the volume of visitors to the SSA's office at One Park Place "regularly exceeds 350 to 700 persons daily," Compl. ¶ 24, and that such use is unreasonable and contrary to the justified expectations of the parties.  In other words, it alleges breach of a contractual duty.  Finally, CanPro argues that it has incurred extraordinary maintenance, security, legal, and other costs "[a]s a direct and proximate result" of the volume and behavior of the SSA's visitors to One Park Place.  <u>Id.</u> ¶ 100.  In other words, CanPro alleges damages caused by the SSA's breach of its contractual duties.

In sum, CanPro alleges a claim for breach of contract.  However, defendant disputes both the existence of a contractual duty and that the damages sought by CanPro were caused by the alleged breach.

### 2.  Duties Under the Lease

The court first addresses the duties owed by the GSA and the SSA under the lease.  The nature of any such duties is a matter of contract interpretation.  Kogan v. United States, 112 Fed. Cl. 253, 264 (2013).  Contract interpretation, including the interpretation of government contracts, is a matter of law.  Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1199-200 (Fed. Cir. 2006); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010) (explaining that general rules of contract interpretation apply to federal government contracts).  Moreover, interpreting a contract is proper at this stage of the proceedings.  See Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir. 2014) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss." (internal quotation marks omitted)); accord Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).

Contract interpretation requires determining the intention of the parties.  Shell Oil, 751 F.3d at 1304; Kogan, 112 Fed. Cl. at 264.  It "starts with the language of the contract.  Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015) (citations omitted); accord Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016) (explaining that "unambiguous contract terms [are given] their plain and ordinary meaning"); Precision Pine, 596 F.3d 817 at 824 ("Contract terms are given their plain and ordinary meaning, unless the provisions are ambiguous.").

Defendant declares that there was no breach of contract because no lease provision limits, or even refers to, the volume of SSA visitors.  However, both parties maintain an implied duty of good faith and fair dealing.  See Alabama v. North Carolina, 560 U.S. 330, 351 (2010); Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014); Bell/Heery, 739 F.3d at 1334; Precision Pine, 596 F.3d at 828; Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Ingham Reg'l Med. Ctr. v. United States, 126 Fed. Cl. 1, 44 (2016); Restatement (Second) of Contracts, supra, at § 205.  Failure to fulfill the implied duty of good faith and fair dealing "constitutes a breach of contract," the same as if an explicit contractual provision was violated.  Metcalf, 742 F.3d at 990.  This duty requires each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party."  Centex, 395 F.3d at 1304, quoted in Metcalf, 742 F.3d at 991.  The reasonable expectations of the parties thus define the contours of the duty of good faith and fair dealing. Metcalf, 742 F.3d at 991; Bell/Heery, 739 F.3d at 1335; Ingham, 126 Fed. Cl. at 44; see also Precision Pine, 596 F.3d at 831 ("The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.").  The implied duty of good faith and fair dealing exists "because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain."  Metcalf, 742 F.3d at 991.

Although no provision in the lease refers to a specific number of visitors, a contract must be viewed in its entirety.[14]  See Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1231 (Fed. Cir. 1997).  Clause 5.13 of the SFO—which is part of the lease—precludes recovery by CanPro for the "normal and customary use of the leased premises during the term of the lease" by the GSA and/or the SSA.  Compl. Ex. A at 39.  In other words, the GSA and/or the SSA are required to use One Park Place in a "normal and customary" manner.  Id.

CanPro contends that the parties intended for the SSA to accommodate a maximum of 250 visitors per day to its office at One Park Place.  Since this intention was allegedly a central premise to executing the lease, CanPro essentially argues that "normal and customary" should be interpreted to include the limitation of 250 daily visitors.  See Reliable Contracting Grp., LLC v. Dep't of Veterans Affairs, 779 F.3d 1329, 1332 (Fed. Cir. 2015) (explaining that "evidence of contemporaneous beliefs about the contract is particularly probative of the meaning of a contract").  However, a party's intention "is determined by an objective reading of the language of the contract, not by that party's statements in subsequent litigation."  Varilease Tech. Grp., 289 F.3d at 799.

The lease itself is an integrated agreement providing that "no prior written or oral agreement, express or implied, shall be admissible to contradict [its] provisions."  Compl. Ex. A at 87.  An integration clause such as this "conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract."  Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003) (internal quotation marks omitted).  As a "rule of substantive law," Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004), the "parol evidence rule renders inadmissible evidence introduced to modify, supplement, or interpret the terms of a fully integrated, unambiguous agreement," Zafer Taahhut Insaat ve Ticaret A.S. v. United States, 833 F.3d 1356, 1366 (Fed. Cir. 2016) (internal quotation marks omitted).  The integrated nature of the lease thus prevents a specific limitation of 250 daily visitors from being read into the lease despite CanPro's repeated references to the alleged limitation after the lease was executed.  The parties had ample opportunity to include such a limit in the lease and never did so.[15]  On the other hand, contrary to defendant's assertion that there is no limit on the amount of visitors to the SSA office, there must necessarily be some limitation on the SSA's "normal and customary use of the leased premises" because the lease provides for a finite area—9,978 square feet of usable floor space with a specific layout and fifty-eight parking spaces.  Thus, there are two reasonable interpretations of the lease.

---

[14]  As an exhibit attached to the complaint, the multiple documents comprising the lease are properly within the pleadings.  RCFC 10(c); Rocky Mountain, 841 F.3d at 1325-26.

[15]  The complaint includes three amendments to the SFO made prior to the lease execution and two amendments to the lease made after its execution but prior to the SSA's occupancy, and refers to two construction change orders not included in the record.  The lease itself also contains twenty custom items in addition to standard general clauses.

When the parties to a contract have different interpretations of a contractual provision that are both reasonable, an ambiguity exists. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999)). A patent ambiguity is "an obvious omission, inconsistency or discrepancy of significance." Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (internal quotation marks omitted). Since it is "obvious," a patent ambiguity "triggers a duty to inquire." NVT Techs., 370 F.3d at 1162. On the other hand, a latent ambiguity arises when there is a "hidden or concealed defect which is not apparent on the face of the [contract], could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." Per Aarsleff, 829 F.3d at 1312.

CanPro reasonably contends that the SSA was limited to accommodating a reasonable number of daily visitors under the "normal and customary use" provision of the lease, and defendant reasonably contends that there was no such limit because the lease does not specify the number of daily visitors. Thus, an ambiguity exists. Since the lease also contains building space specifications, id. at 8, 12, in addition to the "normal and customary use" provision, the lack of an explicit limitation on the number of daily visitors to the SSA office at One Park Place was not so obvious a defect that it created a duty for CanPro to inquire further.[16] Thus, the ambiguity is latent.

If an ambiguity is latent and a party demonstrates that it relied upon the ambiguity, then the court applies the general rule that the ambiguity will be construed against the drafter. LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1317-18 (Fed. Cir. 2009). Here, the GSA drafted the lease. Thus, the court concludes that the "normal and customary" use provision of the lease requires the SSA to limit its visitors to a reasonable number. Therefore, under the implied duty of good faith and fair dealing, the SSA is obligated to limit the daily visitor volume to its office at One Park Place—whether to 250 specifically or to some other undefined but reasonable number.

The "implied duty of good faith and fair dealing" can also be phrased as the "implied duty not to hinder and the implied duty to cooperate." Precision Pine, 596 F.3d at 827. Defendant argues that because CanPro remains able to perform its obligations under the lease by providing the leased space, neither the GSA nor the SSA has acted to "interfere with CanPro's performance of the lease." Def.'s Mot. to Dismiss 39. According to defendant, such a lack of hindrance demonstrates that there has been no breach of the implied duty of good faith and fair dealing. This argument is unpersuasive. "Government actions that are unreasonable under the circumstances" are sufficient to constitute a breach of the implied duty not to hinder performance. Tecom, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005). Although CanPro is able to continue its performance of the lease by providing the leased space at One Park Place, CanPro has alleged facts sufficient to plausibly demonstrate that its performance has been hindered. Specifically, CanPro emphasizes that it has been required to take extraordinary measures due to the SSA's unreasonable failure to limit its visitor volume. Moreover, government "failure to provide assistance at the request of a contractor has amounted to a breach of the duty to cooperate" in certain circumstances. Northrop Grumman Corp. v. United States,

---

[16] To the extent that there was such a duty, CanPro alleges that it inquired and was assured that the visitor volume would not exceed 250 daily during peak times.

47 Fed. Cl. 20, 78 (2000).  If proven, CanPro's allegations concerning the SSA's manner of conducting business despite CanPro's repeated efforts to resolve the situation would constitute a breach of the implied duty to cooperate.

Defendant also argues that because the GSA continues to pay the rent specified in the lease, neither the GSA nor the SSA has acted to "deprive[] CanPro of the expected fruits of the lease."  Def.'s Mot. to Dismiss 39.  This argument is unpersuasive as well.  The implied duty of good faith and fair dealing "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of [its] contemplated value."  Metcalf, 742 F.3d at 991.  Therefore, neither contracting party may interfere with the "reasonable expectations of the other party regarding the fruits of the [lease]."  Id. (quoting Centex, 395 F.3d at 1304).  Moreover, government action that is designed specifically to "eliminat[e] a material part of the consideration" to which a contractor is entitled is a breach of the implied duty of good faith and fair dealing.  Precision Pine, 596 F.3d at 829; see also Bell/Heery, 739 F.3d at 1335 (stating that the implied duty of good faith and fair dealing "guarantees that the government will not eliminate or rescind contractual benefits through action that is specifically designed to reappropriate the benefits and thereby abrogate the government's obligations under the [lease]").  Actions that "solely impact" a particular contract can be considered "specifically targeted" action giving rise to a breach of the implied duty of good faith and fair dealing.  Precision Pine, 596 F.3d at 829-30 (collecting cases).

While CanPro cannot reasonably expect to receive a benefit not specified in the lease, see, e.g., Bell/Heery, 739 F.3d at 1335 (finding no viable claim based on breach of the implied duty of good faith and fair dealing when there were no allegations that the government had "reappropriated benefits promised to [the plaintiff] under the contract"), it remains entitled to the benefit of its bargain.  Here, CanPro alleges that the SSA's actions are specifically targeted because they do not impact any contracts other than the GSA's lease with CanPro.  CanPro also alleges that the SSA's actions are denying CanPro its reasonably expected value of consideration due to the significant increased costs it has incurred.  If proven, CanPro's allegations would constitute a breach of the implied duty of good faith and fair dealing.

Defendant also invokes "the presumption that Government officials act in good faith" and the requirement that "a plaintiff must allege and prove facts constituting malice" to succeed on a breach-of-contract claim based on the implied duty of good faith and fair dealing.  Def.'s Mot. to Dismiss 38.  In support of its argument, defendant relies primarily on Torncello v. United States, 681 F.2d 756, 771 (Ct. Cl. 1982) (en banc), which provides that "good faith is presumed unless bad faith is shown, [thus] the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff."  However, defendant's reliance on Torncello is misplaced.  Torncello was concerned with "the government's claim for otherwise unlimited convenience termination," id., not the implied duty of good faith and fair dealing during the performance of a contract.  Furthermore, Torncello has been limited to "the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."  Salsbury Indus. v. United States, 905 F.2d 1518, 1521 (Fed. Cir. 1990), quoted in Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1582 (Fed. Cir. 1995).  In other words, what remains of Torncello is inapplicable to the facts of this case.  See, e.g., Rumsfeld v.

Applied Cos., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (declining to apply Torncello because the breach of contract that occurred therein—"diverting business that existed away from the contractor"—was not the type of breach at issue). "The presumption of good faith conduct of government officials has no relevance" to the implied duty of good faith and fair dealing. Tecom, 66 Fed. Cl. at 771. The presumption only arises where conduct "approaching fraud or quasi-criminal wrongdoing" is involved. Id. No such conduct is involved here. Therefore, CanPro is not required to plead and prove bad faith on the part of the GSA and/or the SSA to succeed on its claim for breach of the implied duty of good faith and fair dealing.

### 3. Remedies Sought

CanPro can prevail on its claim for breach of the implied duty of good faith and fair dealing only if it can also prove that it suffered damages as a result of the breach. Damages are awarded in breach-of-contract cases in an amount "sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); accord Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing Mass. Bay Transp. Auth., 129 F.3d at 1232). They are calculated by "perform[ing] the necessary comparison between the breach and non-breach worlds." Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008).

To be recoverable, damages must be reasonably foreseeable by the breaching party at the time of contracting, the breach must be a substantial cause of the damages, and the damages must be shown with reasonable certainty. Sys. Fuels, Inc. v. United States, 666 F.3d 1306, 1311 (Fed. Cir. 2012) (citing Ind. Mich. Power Co., 422 F.3d at 1373). A party may not recover damages that could have been avoided with reasonable efforts. Ind. Mich. Power Co., 422 F.3d at 1375 (citing Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002)).

It is reasonably foreseeable that violations of a lease will lead to damages. See, e.g., Rocky Mountain, 841 F.3d at 1327 (explaining that money damages are presumed in breach-of-contract cases). However, defendant contends that CanPro is not entitled to the relief it seeks because CanPro has not alleged a causal connection between the alleged breaches and its claimed damages of $250,000. This argument is without merit because CanPro alleges that the SSA is violating the implied duty of good faith and fair dealing by accommodating an excessive number of daily visitors to its office at One Park Place, that the SSA is responsible for the conduct of its visitors, and that the volume and conduct of the SSA's visitors has directly resulted in CanPro experiencing increased security, maintenance, and other costs. See Greenhill v. United States, 81 Fed. Cl. 786, 792-93 (2008) (discussing the sufficiency of pleadings in alleging the nexus between breach and damages, and emphasizing that "[g]reat[] specificity in pleading the essential elements of breach, proximate cause and damages is not required" to survive an RCFC 12(b)(6) motion to dismiss).

CanPro has, for instance, described the building at One Park Place as having "insufficient space" to accommodate the SSA's visitors, resulting in "excessive overcrowding" and a panoply of other consequences. Compl. ¶¶ 24-29. In addition, contrary to defendant's assertion, CanPro alleges that the SSA is responsible for the conduct of its visitors by asserting that the SSA "has

direct control over the public effects of the chaos caused by the hundreds of daily visitors to the SSA." Id. ¶ 34.  The "Rules and Regulations" of One Park Place, included as an exhibit attached to the complaint, also make building tenants—such as the SSA—responsible for the conduct of themselves and their "employees, agents, licensees and invitees."[17]  Compl. Ex. C at 1.  In particular, Item 11 therein specifies that tenants and their "employees and invitees shall not conduct themselves in any manner which is inconsistent with the character of the Building as a first quality Building or which will impair the comfort and convenience of other tenants in the Building." Id. at 3.

Besides providing examples of prohibited conduct by the SSA's visitors, CanPro has highlighted efforts it has taken to alleviate the effects of the excessive number of daily SSA visitors, such as hiring full-time security guards and multiple attempts to work with the SSA to rectify the situation.  In sum, damages were reasonably foreseeable at the outset of the lease, and CanPro has alleged both (1) the necessary causal connection between the alleged breach and its claimed damages and (2) that it has taken reasonable efforts to mitigate damages.

Defendant also contends that CanPro has not shown its damages with reasonable certainty because it has not explained how the damages were calculated.  However, a detailed damages calculation is not necessary at this stage of the proceedings.  Under the pleading requirements of RCFC 8(a), a plaintiff must show that it is "entitled to relief" and must also include "a demand for the relief sought" in its complaint.  RCFC 8(a) "does not require that the demand for judgment be pled with great specificity."  Van Allen v. United States, 66 Fed. Cl. 294, 297 (2005) (internal quotation marks omitted); see also BMY-Combat Sys. Div. of Harsco Corp. v. United States, 26 Cl. Ct. 846, 850 (1992) (emphasizing that a party is not "required to prove the exact amount of its damages without the benefit of discovery and trial" because "the precise quantum is a question of fact to be determined later in the proceedings"); cf. Sys. Fuels, 666 F.3d at 1311-12 (explaining that "damages need not be 'ascertainable with absolute exactness or mathematical precision' and that reasonable estimates can be used" (quoting Ind. Mich. Power Co., 442 F.3d at 1373)).  CanPro included in its complaint a demand for the type of relief sought with enough specificity that defendant has "fair notice of [CanPro's] claim in order to frame a response."  Van Allen, 66 Fed. Cl. at 297 (internal quotation marks omitted); accord Twombly, 550 U.S. at 555.  Therefore, CanPro meets the pleading requirements for money damages.

In addition to money damages, CanPro seeks termination of the lease.  As with money damages, it is reasonably foreseeable that violations of a lease may necessitate its termination.  Here, CanPro sufficiently alleges that termination of the lease is necessary to prevent further loss.  Thus, it is entitled to pursue this remedy.  See, e.g., Johnson Mgmt. Grp., 308 F.3d at 1260 ("In cases where the government has acted illegally or in error, the courts have not denied remedy appropriate to the circumstances."); see also 28 U.S.C. 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any . . . dispute concerning termination of a contract . . . .").

_____

[17]  For the purposes of this motion, the court assumes (without deciding) that the "Rules and Regulations" are incorporated into the lease and that visitors to the SSA office are invitees.

## IV.  CONCLUSION

The court has considered all arguments of the parties.  To the extent not discussed herein, the court finds them unpersuasive or without merit.

The court lacks jurisdiction to consider CanPro's breach-of-contract claims based on the theories of superior knowledge and impossibility of performance.  The court also lacks jurisdiction to consider CanPro's claim for rescission of the lease.  The court possesses jurisdiction to consider CanPro's breach-of-contract claims based on the theories of mutual mistake, misrepresentation and/or concealment, the implied duty of good faith and fair dealing, commercial impracticability, and frustration of purpose.  The court also possesses jurisdiction to consider CanPro's claims for money damages and termination of the lease.  However, CanPro has failed to state a plausible claim for relief based on mutual mistake, misrepresentation and/or concealment, impracticability of performance, and frustration of purpose.  On the other hand, CanPro has stated a plausible breach-of-contract claim based on the implied duty of good faith and fair dealing for conduct occurring after execution of the lease.

Therefore, the court must grant defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1)—and accordingly deny as moot defendant's motion to dismiss for failure to state a claim upon which this court can grant relief pursuant to RCFC 12(b)(6)—with respect to Counts I and V of the complaint, and those portions of Counts IV and VII that are based on the theories of superior knowledge or impossibility of performance.  The court must deny defendant's RCFC 12(b)(1) motion to dismiss with respect to the remaining counts.  Furthermore, the court must grant defendant's RCFC 12(b)(6) motion to dismiss with respect to Counts II, III, and VI and the remainder of Count VII of the complaint.  Finally, the court must deny defendant's RCFC 12(b)(6) motion to dismiss with respect to the portion of Count IV of the complaint premised on the allegation that the SSA's use of the leased space at One Park Place is unreasonable and beyond the use intended by the parties.

In sum, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss for lack of subject matter jurisdiction.  The court also **GRANTS IN PART**, **DENIES AS MOOT IN PART**, and **DENIES IN PART** defendant's motion to dismiss for failure to state a claim upon which this court can grant relief.  Defendant is directed to file its answer pursuant to RCFC 12(a)(4)(A).

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge