# In the United States Court of Federal Claims

No. 16-268C
(Filed:  May 4, 2020)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| CANPRO INVESTMENTS LTD., | * | |
| | * | |
| Plaintiff, | * | RCFC 12(b)(1); Motion to Dismiss; |
| | * | Jurisdiction; Submission of Claims to |
| v. | * | Contracting Officer; Breach of Contract; |
| | * | Contractual Duty; Good Faith and Fair |
| THE UNITED STATES, | * | Dealing |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Leonor M. Lagomasino, Coral Gables, FL, for plaintiff.

Amanda L. Tantum, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiff CanPro Investments Ltd. ("CanPro") seeks damages pursuant to a lease with the General Services Administration ("GSA") of the United States government for commercial office space to house a local office of the Social Security Administration ("SSA").  Defendant United States moves to dismiss CanPro's sole remaining claim for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  For the reasons set forth below, the court denies defendant's motion in part.

## I. BACKGROUND

A detailed factual description of the parties' dispute is provided in the court's opinion and order granting in part and denying in part defendant's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) ("RCFC 12(b) Ruling") and will not be repeated here.  See CanPro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 331-34 (2017).  In summary, CanPro and the GSA executed the lease at the heart of this dispute on October 22, 2012.  Compl. ¶ 22.  The lease includes 11,475 square feet of rentable space, 9978 square feet of usable space, and 58 parking spaces at One Park Place, a commercial office building owned, operated, and managed by CanPro in Boca Raton, Florida.  Compl. ¶ 2; Compl. Ex. A at 8-9.  The excessive volume and unruly conduct of the SSA's visitors began to cause problems for CanPro and the One Park Place tenants shortly after the lease term began, Compl. ¶¶ 24-30, ultimately leading CanPro to file a certified claim with the GSA contracting officer ("CO") on November 12, 2014.  Id. ¶ 5; Def.'s Mot., App. 6-13.  CanPro articulated the following allegations in the claim:

- During lease negotiations, all parties understood that the SSA's intended visitor volume would be reasonable, not to exceed 250 visitors daily.

- Visitors to the SSA's office at One Park Place regularly exceed 400-500 daily.

- There is insufficient space to accommodate the excess visitors, which is disruptive to the entire building.  CanPro regularly receives complaints from other tenants regarding the SSA's visitors.

- The excessive volume of SSA visitors has resulted in (1) numerous arrests for drugs and weapons, (2) tenants fearful of their safety, (3) litter, (4) harassing behavior, (5) loitering, (6) creation of de facto smoking areas and waiting rooms, and (7) visitors leaving personal items behind.

- The perception of One Park Place in the Boca Raton office marketplace has deteriorated.

- The SSA's manner of conducting business is "totally beyond any reasonable use of the premises."

- The GSA "materially breached" the lease and the "implied covenant of reasonable use" by scheduling and accommodating approximately 500 visitors daily.

- CanPro suffered loss of tenants, loss of quiet use and enjoyment, loss of reputation and business relationships, excess physical damage to the building, and increased security and maintenance expenses.

- CanPro provided ample notice and opportunity for the GSA and the SSA to remedy the situation.

Def.'s Mot., App. 6-12.  CanPro sought $250,000 in damages and termination of the lease.  Id. at 11-12.

The contracting officer issued a final decision denying CanPro's claim on March 6, 2015, Compl. ¶ 6, Compl. Ex. B, and CanPro filed the instant complaint on February 26, 2016.  In its complaint, CanPro asserts that the SSA regularly receives 350-700 daily visitors at One Park Place.  Id. ¶ 24.  Furthermore, CanPro alleges that the SSA's visitors have exhibited significant disruptive behavior, causing CanPro to experience additional maintenance and security costs (such as hiring full-time security guards), decreased use and enjoyment of the property, damage to its reputation, litigation expenses, and lost business opportunities.  Id. ¶¶ 24-33.  CanPro also claims that the volume of visitors "exceeds what was reasonably expected by CanPro based on communications with the GSA and/or SSA prior to entering into the lease."  Id. ¶ 33.  CanPro asserted the following claims for relief:

- Count I:  breach of contract—superior knowledge, id. ¶¶ 42-59;

- Count II:  breach of contract—mutual mistake, id. ¶¶ 60-70;

- Count III:  breach of contract—misrepresentation and/or concealment, id. ¶¶ 71-83;

- Count IV:  breach of the implied duty of good faith and fair dealing, id. ¶¶ 84-101;

- Count V:  breach of contract—impossibility of performance, id. ¶¶ 102-07;

- Count VI:  breach of contract—commercial impracticability, id. ¶¶ 108-13; and

- Count VII:  restitution for frustration of purpose, id. ¶¶ 114-16.

As in its certified claim, CanPro seeks $250,000 in damages and termination of the lease. Id. at 18.

On June 13, 2016, defendant filed its first motion to dismiss, requesting that the court dismiss CanPro's complaint pursuant to RCFC 12(b)(1) and RCFC 12(b)(6).  Granting the motion in part, the court dismissed each count of CanPro's complaint but Count IV:  breach of the implied duty of good faith and fair dealing.[1]  CanPro, 130 Fed. Cl. at 352.  Defendant challenged Count IV's survival in a motion for reconsideration, which this court denied.

On July 31, 2019, defendant filed the instant motion to dismiss.  Defendant now alleges that the court lacks subject matter jurisdiction over CanPro's single remaining claim, and therefore asks the court to dismiss the claim pursuant to RCFC 12(b)(1).  Defendant advances two separate grounds for dismissal:  first, that CanPro has changed the legal basis of its claim submitted to the CO ("Section II.A"); and second, that CanPro has not submitted a number of its alleged injuries and damages to the CO ("Section II.B").  After CanPro indicated that it planned to file a new claim with the CO to address some of the concerns raised in defendant's motion to dismiss, this court stayed briefing on the motion.

CanPro submitted its new claim to the CO on January 23, 2020.  As of the date of this decision, the CO has not issued a decision.  Over CanPro's objection, the court ordered the parties to resume briefing on Section II.A of defendant's motion, while maintaining the stay as to briefing on Section II.B.  On March 10, 2020, CanPro filed its response to Section II.A.  CanPro maintains that although it did not explicitly describe its legal injury as a violation of the duty of good faith and fair dealing when it submitted its initial claim to the CO, its initial claim and its complaint rely on the same operative facts.

---

[1] The court also dismissed part of Count IV, to the extent that Count IV was based on the GSA's superior knowledge, because this theory was not presented to the CO.  CanPro, 130 Fed. Cl. at 336-37.

In its March 30, 2020 reply, defendant asserts that the factual basis for CanPro's claim has changed.  In its initial claim, defendant notes, CanPro alleged that "[d]uring the lease negotiations, it was understood by all parties that SSA's intended volume of visitors would be reasonable and not exceed 250 visitors per day."  Def.'s Mot., App. 7.  CanPro's complaint contained similar assertions.  See Compl. ¶ 16.  However, defendant maintains that during discovery, "CanPro acknowledge[d] that there was no discussion of 250 visitors '[d]uring the lease negotiations,' as it asserted in its claim submitted to the [CO]."  Def.'s Reply 6 (quoting Def.'s Mot., App. 7).  Defendant explains that it had asked CanPro, through an interrogatory request, to

> [d]escribe in detail the basis for any assertion(s) by CanPro that CanPro was informed that the number of visitors (defined by CanPro to include both visitors and individuals accompanying visitors) to the SSA office (at Delray Beach or at One Park Place, whether prior to or after relocating there) would not exceed 250, including but not limited to the date, time, and location of any alleged discussions, the identity of the individuals participating in this discussion, and the substance of such discussions.

Def.'s Reply, App. 4-5.  Defendant indicates that CanPro responded as follows:

> Prior to SSA's occupancy, Sara Lowe visited the Delray Beach SSA office in order to show Karen Gonyer, the SSA manager at the time, certain carpet samples.  At that time, Ms. Lowe observed a line of people waiting to enter into the SSA offices.  Ms. Lowe expressed her concern to Ms. Gonyer as to the volume [of] individuals in line and inquired of Ms. Gonyer the number of visitors which visited the Delray Beach SSA offices on a daily basis.  Ms. Gonyer explained that the number of visitors do not exceed 250 at peak times during high season and was significantly less than that during low season.  Ms. Gonyer also explained that the SSA offices at One Park Place were going to be administrative offices such that the volume of visitors [would] be less than those seen at the Delray Beach office.  Ms. Gonyer also explained that the SSA was anticipating that the SSA clients would be using the online features more and more which would further decrease traffic.  Ms. Gonyer repeated this representation at a later date to Ms. Lowe and Ms. Geruza Delima in the CanPro management offices.

Id. at 5.  Defendant interprets this response as a change in CanPro's position regarding the timing of the alleged representation.  Def.'s Reply 6-7.  Citing deposition testimony from Ms. Gonyer, and emphasizing that Ms. Gonyer would not have needed to review carpet samples until after the lease had been finalized, defendant asserts that this conversation could not have taken place during lease negotiations.  Id. at 7.  Thus, defendant alleges, CanPro "has changed the basis of its claim from the information purportedly provided during lease negotiations to information allegedly provided well after the parties entered into the lease."  Id.

Section II.A of defendant's motion to dismiss has been fully briefed, and the court considers oral argument unnecessary.

## II. LEGAL STANDARDS

### A. RCFC 12(b)(1)

In determining whether subject-matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Faced with a motion to dismiss for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject-matter jurisdiction. Id. If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014). If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B. The Contract Disputes Act

Under the Tucker Act, the United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). The Tucker Act also confers upon the Court of Federal Claims the jurisdiction to entertain claims arising under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109 (2012), in other words, "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the [CO] has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2).

For such jurisdiction to exist, a contractor must first submit a timely written claim, generally within six years of its accrual date, to the CO. See 41 U.S.C. § 7103(a)(1)-(2), (4)(A). Next, the CO must issue a timely written decision. Id. § 7103(a)(3). Lastly, the contractor must file an appeal with this court "within 12 months from the date of receipt of a [CO's] decision." Id. § 7104(b)(3).

With respect to what constitutes a claim, the CDA is silent. However, according to the Federal Acquisition Regulation ("FAR"), a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." FAR 52.233-1(c). For claims greater than $100,000, the regulation further requires the contractor to certify that (1) "the claim is made in good faith"; (2) "the supporting data are accurate and complete to the best of the contractor's knowledge and belief"; (3) "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable"; and (4) "the certifier is authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 7103(b)(1).

Significantly, the claim need not be "submitted in any particular form or use any particular wording." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). Rather, "[a]ll that is required is that the contractor submit in writing to the [CO] a clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of the claim." Id. "The purpose of this requirement is resolution at the [CO] level, an objective that would be hindered if the claim heard in court is substantially different from the one presented to the [CO]." Affiliated Constr. Grp., Inc. v. United States, 115 Fed. Cl. 607, 611-12 (2014) (citing M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1331 (Fed. Cir. 2010)). Thus, for this court to have jurisdiction over an appeal of the CO's decision, the complaint must be "based on the same claim previously presented to and denied by the [CO]." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987); see also 41 U.S.C. § 7104(b). To determine whether the claims are the same, the court must examine whether the claims (1) are based on the same underlying theory; (2) seek the same relief; and (3) arise from the same operative facts. Johnson Controls World Servs., Inc., v. United States, 43 Fed. Cl. 589, 594 (1999).

Operative facts are those "essential facts that give rise to a cause of action." Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 420 (2003). "In making such a determination, if the court will have to review the same or related evidence to make its decision, then only one claim exists, but if the claim presented to the [CO] requires examination of a different or unrelated set of operative facts, then the claims are separate." Affiliated Constr. Grp., 115 Fed. Cl. at 612 (internal citations and quotation marks omitted). Stated differently, if the court must review "different kinds of proof, they are different claims for purposes of the CDA." Id. (citing Placeway Constr. Corp. v. United States, 920 F.2d 903, 909 (Fed. Cir. 1990); AAB Joint Venture v. United States, 75 Fed. Cl. 414, 422-23 (2007)). In short, "[t]he critical test appears to be whether the scheme of adjudication prescribed by the CDA is undermined by the contractor's claim on appeal—that is, by circumventing the statutory role of the [CO] to receive and pass judgment on the contractor's entire claim." Cerberonics, 13 Cl. Ct. at 418.

### C. The Implied Duty of Good Faith and Fair Dealing

In every contract, including government contracts, both parties maintain an implied duty of good faith and fair dealing. See Alabama v. North Carolina, 560 U.S. 330, 351 (2010); Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1334-35 (Fed. Cir. 2014); Precision Pine & Timber, Inc., 596 F.3d 817, 828 (Fed. Cir. 2010); Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981). The "implied duty of good faith and fair dealing" can also be understood as the "implied duty not to hinder and the implied duty to cooperate." Precision Pine, 596 F.3d at 827. "Government actions that are unreasonable under the circumstances" are sufficient to constitute a breach of the implied duty not to hinder performance. Tecom, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005). Similarly, government "failure to provide assistance at the request of a contractor has amounted to a breach of the duty to cooperate" in certain situations. Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 78 (2000). Failure to fulfill the implied duty of good faith and fair dealing "constitutes a breach of contract," the same as if an explicit contractual provision was violated. Metcalf, 742 F.3d at 990. The implied duty of good faith and fair dealing exists "because it is rarely possible to anticipate

in contract language every possible action or omission by a party that undermines the bargain." Id. at 991.

## III. ANALYSIS

### A. CanPro's Certified Claim and Complaint Rely on the Same Legal Basis

The court begins its jurisdictional inquiry by comparing the "implied covenant of reasonable use," the legal theory most clearly articulated in CanPro's certified claim, to the "implied duty of good faith and fair dealing," the legal theory asserted in Count IV of CanPro's complaint. These theories are far more complementary than defendant acknowledges. Likening the "implied covenant of reasonable use" to the "implied covenant against waste," defendant asserts in its motion that this theory "either (1) prohibit[s] a tenant from leaving a leased property vacant or (2) requir[es] a tenant to restore a property to the landlord, at the end of a lease term, in the same condition in which it was received, except for reasonable wear and tear." Def.'s Mot. 11 (citing K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005-06 (Fed. Cir. 2015)). The court finds defendant's interpretation of this legal theory too narrow. Reasonable use may be "associated with the 'implied covenant against waste,'" id., as defendant emphasizes, but the phrase "reasonable use" does not always implicate this implied covenant. After all, reasonable use is also "associated with" riparian rights,[2] easements,[3] and zoning ordinances.[4] Much depends on context, and here, defendant's rendering of this implied covenant ignores the context in which CanPro invokes it. Defendant's analysis and the case law it relies upon revolve around terms like "waste" and "reasonable wear and tear"—terms that do not appear in CanPro's certified claim.[5] Instead, throughout its claim, CanPro employs terms like "reasonable," "unreasonable,"

---

[2]  See, e.g., 93 C.J.S. Waters § 253 ("Under the 'reasonable use of surface water rule,' each possessor is legally privileged to make a reasonable use of his or her land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his or her harmful interference with the flow of surface waters is unreasonable."); Ball v. United States, 1 Cl. Ct. 180, 183 (1982) (applying the reasonable use rule in the context of a Fifth Amendment taking).

[3]  See, e.g., Wash. Metro. Area Transit Admin. v. Georgetown Univ., 347 F.3d 941, 949-50 (D.C. Cir. 2003) (acknowledging and analyzing "the dominant tenement's right to reasonable use of an easement); Illig v. United States, 58 Fed. Cl. 619, 630-31 (2003) (evaluating the "reasonable use" of land burdened by easements under Missouri law).

[4]  See, e.g., 83 Am. Jur. 2d Zoning & Planning § 733 (discussing how property owners may demonstrate that "a zoning variance is necessary for the reasonable use of land"); Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 15 n.6 (1st Cir. 1999) ("Under New Hampshire law, a variance may be denied absent a showing of 'unnecessary hardship,' . . . and hardship is sometimes equated with a showing that applying the zoning ordinance would prevent the applicant from making 'any reasonable use' of the property as zoned." (citations omitted)).

[5]  While recognizing that this detail is not determinative, the court observes that the CO's final decision discussed none of the "reasonable wear and tear" concepts advanced by defendant.

and "reasonable use" to refer broadly to its dissatisfaction with the volume and conduct of the GSA's visitors:[6]

- "During the lease negotiations, it was understood by all parties that SSA's intended volume of visitors would be <u>reasonable</u> and not exceed 250 visitors per day."  Def.'s Mot., App. 7.

- "However, the daily influx of SSA's invitees has massively exceeded a <u>reasonable</u> number . . . ."  <u>Id.</u>

- "The daily count of people that SSA brought into One Park Place and onto the Leased Premises . . . is . . . far in excess of any <u>reasonable use</u> of the Leased Premises . . . ."  <u>Id.</u>

- "SSA's <u>unreasonable</u> number of visitors creates a mob scene daily in the lobby and common areas."  <u>Id.</u> at 8.

- "The <u>unreasonably</u> excessive number of visitors has also resulted in crowds of SSA's guests creating de facto 'smoking areas' in various areas of the premises."  <u>Id.</u>

- "SSA's conduct and manner of conducting business is . . . totally beyond any <u>reasonable use</u> of the premises."  <u>Id.</u> at 9.

Rather than implicating concepts of "waste" or "reasonable wear and tear," CanPro seems to assert that, as this court stated in its RCFC 12(b) Ruling, "the GSA and/or the SSA are required to use One Park Place in a 'normal and customary' manner."  <u>CanPro</u>, 130 Fed. Cl. at 348 (quoting Compl. Ex. A at 39); <u>see also id.</u> ("[C]ontrary to defendant's assertion that there is no limit on the amount of visitors to the SSA office, there must necessarily be some limitation on the SSA's 'normal and customary use of the premises' because the lease provides for a finite area . . . .").

At worst, CanPro's reference to an "implied covenant of reasonable use" is imprecise. But imprecision is not jurisdictionally fatal where, as here, CanPro clearly and consistently advances a single grievance.  Rather than reading CanPro's claim as a thickly-veiled invocation of the implied covenant against waste, the court views it as a comprehensive objection to the volume and conduct of the SSA's visitors.  This objection, in turn, is fully compatible with the more refined legal theory raised in the complaint.  Failure to abide by the "reasonable use" of the premises, even in the absence of bad faith, may certainly violate the duty of good faith and fair dealing by "destroy[ing] the reasonable expectations of the other party regarding the fruits of the

---

Instead, the CO pointedly addressed CanPro's concerns related to visitor volume and visitor behavior.  <u>See</u> Compl. Ex. B at 1-2.

[6]  All emphasis in the following bulleted quotations has been added by the court.

contract." Centex, 395 F.3d at 1304; see TigerSwan, Inc. v. United States, 110 Fed. Cl. 336, 346 (2013) ("[P]roof of 'bad faith' is not required to show a breach of the implied duty of good faith and fair dealing in most cases.").

In its RCFC 12(b) Ruling, this court stressed that CanPro's reference in its certified claim to the "covenant of reasonable use" had "put the GSA contracting officer on notice of the allegation that the SSA's use of One Park Place was unreasonable and beyond the use intended by the parties," an allegation that, in part, formed the foundation of Count IV. CanPro, 130 Fed. Cl. at 339. Defendant has given the court no reason to depart from this position now. For the reasons discussed above, the court determines that CanPro's certified claim gave the contracting officer adequate notice of the legal theory later articulated in its complaint.

### B. CanPro's Certified Claim and Complaint Arise From the Same Operative Facts

Even when claims "assert differing legal theories for . . . recovery," the court is not deprived of jurisdiction if the claims "arise from the same operative facts [and] claim essentially the same relief." Ace Constructors, Inc. v. United States, 499 F.3d 1357, 1361 (Fed. Cir. 2007). Thus, the court cannot properly evaluate the legal theories advanced by CanPro in isolation from the facts alleged. This holistic approach demonstrates that whether CanPro grounds its allegations in an "implied covenant of reasonable use" or the duty of good faith and fair dealing, the court must "review the same or related evidence to make its decision." See Affiliated Constr. Grp., 115 Fed. Cl. at 612 (quoting Kinetic Builders, Inc. v. Peters, 226 F.3d 1307, 1312 (Fed. Cir. 2000)). Since it filed its certified claim, CanPro has consistently urged inquiry into the parties' expectations regarding visitor volume, the actual visitor volume, and the impact of that visitor volume on the daily operations of One Park Place. The court sees no material difference between the evidence relating to these issues, already reviewed by the CO, and the evidence the court must review to adjudicate Count IV of CanPro's complaint.

Prior precedent regarding CDA jurisdiction supports this conclusion. In M. Maropakis Carpentry, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") found no jurisdiction when the contractor's initial claim noted a past extension request, but did not place the government "on actual notice of the specific number of days of extension that [it] would ultimately request" and did not seek a final decision regarding extensions. 609 F.3d at 1328-29. In Spirit Leveling Contractors v. United States, the United States Claims Court found no jurisdiction when plaintiff's certified claim attributed performance issues to weather conditions, but plaintiff's complaint attributed performance issues to defendant's actions. 19 Cl. Ct. 84, 90 (1989). And in Armour of America v. United States, the Court of Federal Claims found no jurisdiction when plaintiff's claim alleged improper default termination, but the complaint alleged that defendant breached the contract by issuing defective specifications. 69 Fed. Cl. 587, 590 (2006). The court emphasized that while the claim submitted to the CO "require[d] consideration of the respective fault of the Plaintiff and Defendant in termination of the contract, the costs incurred by the Plaintiff on the work completed and the profits earned therefrom," id., the later complaint "rest[ed] on review and comparison of the specification and the drawings, as well as on the determination of the costs and unearned profits," id.

Cases like <u>M. Maropakis Carpentry</u>, <u>Spirit Leveling</u>, and <u>Armour of America</u> demonstrate a clear shift in the scope of the factual inquiry between the claim submitted to the CO and the complaint.  Raising, for the first time in a complaint, factual questions related to extension duration, government misrepresentations, or defective specifications requires a court to shift and expand the inquiry beyond what was required of the CO.  CanPro's claim, in contrast, is more naturally compared to that considered in <u>Scott Timber Co. v. United States</u>.  There, the Federal Circuit found that the Court of Federal Claims retained jurisdiction when the certified claim broadly questioned the reasonableness and duration of certain contract suspensions, but the later complaint raised a specific warranty issue and other objections to the government's "preparation and administration of the contracts." 333 F.3d 1358, 1365 (Fed. Cir. 2003).  The court reasoned that the CO had been given "clear notice of a purported breach of contract based on the prolonged and allegedly unauthorized suspensions." <u>Id.</u> at 1365-66.  Similarly, CanPro has never strayed from the fundamental factual allegations first raised in its certified claim.

While the evidentiary landscape of this case has evolved since the parties began discovery, these developments do not change the court's analysis.  Defendant's alleged representation to CanPro that the daily visitor volume would stay below 250 will be an operative fact no matter when that representation occurred.  Thus, evaluating CanPro's interrogatory response will not "require different kinds of proof" from that required to evaluate the claim or the complaint.[7]  <u>See</u> <u>AAB Joint Ventures v. United States</u>, 68 Fed. Cl. 363, 366 (2005). Moreover, the CDA does not force the court to relinquish jurisdiction every time new evidence emerges.  <u>See</u> <u>K-Con</u>, 778 F.3d at 1006 ("[M]erely adding factual details . . . does not create a different claim . . . .").  "[T]he rule that a complaint may not seek a different remedy or be based on a different factual or legal predicate should not be imposed in such a way to preclude all adjustments of plaintiff's claim 'based upon matters developed in litigation.'" <u>U.S. Enrichment Corp. v. United States</u>, 121 Fed. Cl. 532, 535 (2015) (quoting <u>K-Con</u>, 778 F.3d at 1005).

As urged by the Federal Circuit, this court has applied the jurisdictional requirements of the CDA "in a practical way."  <u>See</u> <u>K-Con</u>, 778 F.3d at 1006.  No claim will remain perfectly static during extended litigation; plaintiffs will inevitably refine their legal theories and expand the factual record.  CanPro, however, has consistently advanced the same narrative:  that One

---

[7]  On this point, defendant overstates the applicability of <u>Affiliated Construction Group.</u> In its claim, complaint, and oral argument, the plaintiff in that case asserted that government-ordered changes had substantially increased its cost of performance. 115 Fed. Cl. at 610.  Then, during post trial supplemental briefing, the plaintiff for the first time attributed its cost increases to the fact that the existing duct work at the renovation site was not code-compliant.  <u>Id.</u> at 610-11.  The plaintiff's ultimate claim, as articulated during post trial supplemental briefing, turned on one key factual allegation that was absent from its certified claim and complaint:  that "the room was unexpectedly found to violate code requirements." <u>Id.</u> at 613.  Potential code-requirement violations would have sparked an entirely new inquiry for the <u>Affiliated Construction Group</u> court.  This court accepts defendant's proposition that the court could lose jurisdiction if a plaintiff substantially changes course mid litigation, but the court rejects the notion that an analogous shift occurred here.  Indeed, in this case, the discovery developments will only lead the court deeper into the inquiry it was already conducting:  the parties' reasonable expectations regarding the visitor volume at One Park Place.

Park Place was burdened by an unreasonable visitor volume, attributable to the SSA's unreasonable use of the premises, resulting in a very specific list of injuries.  Thus, in keeping with the purpose of the CDA's jurisdictional requirements, the GSA's CO was given "an ample pre-suit opportunity to rule on [the] request, knowing at least the relief sought and what substantive issues are raised by the request."  Id.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, the court finds them unpersuasive or without merit.

The court concludes that Count IV of CanPro's complaint does not present a new claim for purposes of jurisdiction under the CDA.  Therefore, the court **DENIES IN PART** defendant's motion to dismiss for lack of subject matter jurisdiction.  Section II.A of defendant's motion is hereby denied.  Briefing on Section II.B of defendant's motion remains stayed.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge